CHEVRON U.S.A., INC., et al.,
Plaintiffs-Appellees,

and

Intercontinental Bultank Corporation, et
al., Intervening Plaintiffs-Appellees,

v.

Jay S. HAMMOND, Governor of the
State of Alaska, et al.,
Defendants-Appellants,

and

Cordova District Fisheries Union, et al.,
Intervening Defendants-Appellants.

No. 81–3700.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 18, 1982.

Decided Feb. 3, 1984.

Charles P. Diamond, Richard E. Sherwood, Ira M. Feinberg, Franklin A. Gevurtz, O'Melveny & Myers, Los Angeles, Cal., Michael Robbins, Hartig, Rhodes, Norman, Mahoney & Edwards, John A. Treptow, Atkimson, Conway, Young, Bell & Gagnon, Anchorage, Alaska, Raymond J. Burke, Jr., Burke & Parsons, New York City, for appellees.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Michael R. Spaan, U.S. Atty., Anchorage, Alaska, Philip A. Berns, Paul

Gary Sterling, San Francisco, Cal., LCDR Hal W. Henderson, Washington, D.C., for amicus curiae U.S. in support of the appellees.

Wilson L. Condon, Atty. Gen., Douglas K. Mertz, Asst. Atty. Gen., Juneau, Alaska, for defendants-appellants.

Robert E. Mintz, Anchorage, Alaska, for intervening defendants-appellants.

Before PREGERSON, ALARCON, and NELSON, Circuit Judges.

PREGERSON, Circuit Judge:

Alaska Statute § 46.03.750(e) (1976) [1] prohibits oil tankers from discharging ballast into the territorial waters of Alaska if that ballast has been stored in the vessel's oil cargo tanks. On appellees' motion for partial summary judgment, the district court invalidated this Alaska statute. The court ruled that the statute is preempted by Coast Guard regulations promulgated under Title II of the Ports and Waterways Safety Act of 1972, *as amended by* the Ports and Tanker Safety Act of 1978 (PWSA/PTSA), 46 U.S.C. § 391a (Supp. V 1981). We reverse.

BACKGROUND

Unloaded oil tankers must take on seawater for ballast to ensure proper submergence and vessel stability. Upon arrival in port, the tankers must then discharge this ballast—i.e., "deballast"—before loading their cargo tanks with oil. Ballast held in empty oil tanks will contain oil residue.

Both the state and federal governments have been concerned about the danger to the marine environment caused by regular pumping of large quantities of oil-polluted ballast into the ocean.

During the past three decades, the federal government has sought to minimize environmental harm from oil tankers through a series of increasingly stringent statutes and international conventions. These measures cover many aspects of tanker safety, design, and traffic control. They also encompass measures designed to prevent accidental oil spills and authorize the Coast Guard to regulate deballasting. Pursuant to this authority, Coast Guard regulations prohibit deballasting from oil cargo tanks within fifty miles of shore. 33 C.F.R. §§ 157.29, 157.37(a)(1) (1982). An exception is made, however, for the carefully monitored discharge of so-called "clean" ballast. 33 C.F.R. § 157.43(a). "Clean" ballast is that which "if discharged from a vessel that is stationary into clean, calm water on a clear day would not produce visible traces of oil on the surface of the water or on adjoining shore lines . . . ." 33 C.F.R. § 157.03(e)(1).

This deballasting prohibition and exception promulgated by the Coast Guard were first conceived by an international body in 1969, as part of amendments made that year to the 1954 International Convention for the Prevention of Pollution of the Sea by Oil.[2] Two subsequent major international agreements also considered tanker pollution problems, including those caused by deballasting. They are the 1973 International Convention for the Prevention of Pollution from Ships (MARPOL) and the

---

1. Cargo in tank vessels . . . engaged in the marine transportation of crude oil, refined petroleum products or their by-products may not be placed in segregated ballast tanks, nor may ballast be placed in cargo tanks of those tank vessels having segregated ballast systems. However, the department may by regulation permit the placing of ballast in the cargo tanks of those vessels in emergency situations. *All ballast placed in cargo tanks shall be processed by or in an onshore ballast water treatment facility and may not be discharged into the waters of the state.*
Alaska Stat. § 46.03.750(e) (1976) (emphasis added). The amended version of this statute is

now found at Alaska Stat. § 46.03.750(a) & (b) (1980), *see infra* n. 21.

2. See note 20 for the text of the 1969 amendments relating to the deballasting prohibition and exception, as enacted by the Oil Pollution Act Amendments of 1973 (OPAA), Pub.L. No. 93–119, 87 Stat. 424, *codified at* 33 U.S.C. §§ 1001–1016 (1976), *repealed and superseded by* Act to Prevent Pollution from Ships, Pub.L. No. 96–478, 94 Stat. 2297 (1980), *codified at* 33 U.S.C. §§ 1901–1911 (Supp. V 1981).

Protocol of the 1978 International Conference on Tanker Safety and Pollution Prevention (the MARPOL Protocol). *See* 33 U.S.C. §§ 1901–1911 (Supp. V 1981) (the enabling legislation to the MARPOL Protocol). The PWSA/PTSA and attendant Coast Guard regulations—including the deballasting standard at issue in this case—are based in large part upon MARPOL and the MARPOL Protocol. Although MARPOL, the MARPOL Protocol, and the PWSA/PTSA made significant advances in a number of other areas of pollution control, no changes were made to the "clean" deballasting exception originally adopted by the 1969 convention.[3]

The PWSA/PTSA and the international conventions also addressed environmental problems posed by deballasting by requiring increasingly stricter design features and operational equipment on tankers. For example, new tankers of a certain size are required to have separate tanks to be used for ballast only and to have crude oil washing systems to clean the cargo tanks. 46 U.S.C. § 391a(7); 33 C.F.R. §§ 157.09(2), 157.35. In some respects, the PWSA/PTSA and Coast Guard regulations are even more stringent than international standards. For example, the PWSA/PTSA imposes design requirements on ships smaller than those covered by the MARPOL Protocol. 46 U.S.C. § 391a(7)(A). The Coast Guard, however, has never adopted a more restrictive definition of "clean ballast" and continues to enforce the same standards originally introduced by an international convention in 1969.

Meanwhile, the Alaska legislature has determined that even the small amount of oil contained in ballast meeting the federal definition of "clean" causes harm to the Alaskan marine environment. Thus, Alaska Stat. § 46.03.750(e) provides that absolutely no ballast water that has been held in oil cargo tanks may be discharged into the waters of the state. Absent an emergency, all tankers must use on-shore facilities to process ballast water containing oil.

DISCUSSION

In addressing the issue of federal preemption presented by this case, we divide our discussion into two major inquiries.[4] In the absence of express preemption language, we first address the threshold question whether Congress in passing the PWSA/PTSA implicitly intended to occupy the field of regulating pollution from oil tankers within a state's territorial waters. In determining congressional intent, relevant subjects include the Supreme Court's decision in *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978); comprehensiveness of federal regulations; consideration of state police power; congressional intent that there be collaborative federal/state efforts to protect the marine environment; need for uniform regulation; history of regulation of the subject matter; and available legislative history. After addressing the threshold question, we conclude that Congress in passing the PWSA/PTSA did not intend to occupy the field of regulating pollution from oil tankers within a state's territorial waters. Having concluded that Congress did not intend to foreclose all state legislation in this field, we then address the second major question whether the Alaska statute is nonetheless void because it actually conflicts with the PWSA/PTSA and implementing Coast Guard regulations. On this critical issue, after considering the need to find actual conflict, the importance of reconciling the statutory schemes, and the objectives of the federal and state legislation, we conclude that no such conflict exists.

---

3. Although the PWSA/PTSA is based in large part on the international agreements discussed in our opinion, the specific deballasting standard promulgated internationally in 1969 is not spelled out in the PWSA/PTSA. That statute does, however, give regulatory authority over deballasting to the Coast Guard, 46 U.S.C. § 391a(6)(A)(vii) (Supp. V 1981), which has exercised this authority by adopting regulations, 33 C.F.R. §§ 157.03(e)(1), 157.29, 157.-37(a)(1) & 157.43(a), consistent with the 1969 international deballasting standards.

4. This two-tier inquiry was specifically espoused by the Supreme Court in *Silkwood v. Kerr-McGee Corp.*, —— U.S. ——, ——, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984).

I. *In Passing the PWSA/PTSA, Did Congress Implicitly Intend to Occupy the Field of Regulating Oil Tanker Pollution Within a State's Territorial Waters?*

The PWSA/PTSA contains no explicit expression of congressional intent to preempt state law regulating oil tanker pollution within a state's territorial waters. Therefore, we must apply principles of preemption analysis to the challenged state statutory provision to determine implicit legislative intent. In this task, we are assisted by the fact that ours is not the first case to examine the preemptive effect of the PWSA/PTSA on state law. In *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978), the Supreme Court examined the effect of the PWSA on a number of Washington statutes, including provisions requiring certain design safety features for tankers operating in Puget Sound. The Court held that these "design requirements, standing alone, are invalid in light of the PWSA and its regulatory implementation." 435 U.S. at 160–61, 98 S.Ct. at 996. After examining the PWSA's comprehensive scheme for regulating tankers, the Court found that Congress had entirely occupied the field as to tanker design requirements:

This statutory pattern shows that Congress, insofar as *design characteristics* are concerned, has entrusted to the Secretary the duty of determining which oil tankers are sufficiently safe to be allowed to proceed in the navigable waters of the United States. This indicates to us that Congress intended uniform national standards for design and construction of tankers that would foreclose the imposi-

tion of different or more stringent state requirements.

435 U.S. at 163, 98 S.Ct. at 997 (emphasis added).

The Court's finding of preemption is specifically limited to the regulation of vessel "design characteristics" and thus does not control the outcome of the present case involving ocean pollutant discharges.[5] As a matter of fact, the court specifically explained that tankers must meet "otherwise valid state or federal rules or regulations that do not constitute design or construction specifications." 435 U.S. at 168–69, 98 S.Ct. at 999–1000. Even though *Ray* does not control the outcome of the present case, in addressing the preemption issue, we nonetheless are guided by the analytical approach followed in *Ray*. This approach recognizes the significance of the subject matter regulated. As we stressed in *Morseburg v. Balyon*, 621 F.2d 972 (9th Cir.1980), the subject matter of regulation is critical in preemption analysis. Therefore, in making a preemption analysis, a court should examine those concerns emphasized by Congress in enacting the subject legislation.

When the emphasis is to protect and strengthen national power, "occupation" and "conflict" are easily found while not so easily found when the emphasis is to promote federalism.

. . . .

. . . [T]he choice of emphasis is heavily influenced by the area of the law in which the issue arises. Thus, when the area concerns foreign affairs, as in *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941), or labor relations, as in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the emphasis, not sur-

---

**5.** In *Ray,* the Court addressed a number of preemption issues under both Titles I and II of the PWSA. As *Ray* explains, "[t]he focus of Title I, 33 U.S.C. §§ 1221–1227, is traffic control at local ports; Title II's principal concern is tanker design and construction." 435 U.S. at 161, 98 S.Ct. at 996. For purposes of our preemption analysis, Title II is the relevant portion of the PWSA/PTSA because the Act's deballasting provisions are found there. 46 U.S.C. § 391a. *Ray* found several parts of

Washington State's tanker provisions preempted by the PWSA, but did so primarily in the area of traffic control governed by Title I. In reaching its ruling, the Court was governed by Title I's express preemption language. 435 U.S. at 158–59, 171–75, 98 S.Ct. at 994–995, 1001–1003. The Court's sole preemption finding under Title II was confined to design specifications. 435 U.S. at 168, 98 S.Ct. at 999–1000.

prisingly, is on the national interest, while when the area is protection of consumers of commodities, as in *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), the emphasis understandably is upon the state's interest particularly and the imperatives of federalism generally....

621 F.2d at 976–77.

There are significant differences between the subject matter regulated in *Ray*—vessel design features—and that regulated here—ocean pollutant discharges. *Ray* recognizes these differences. As to design features, the Court noted that it "[had] previously observed that ship design and construction standards are matters for national attention." 435 U.S. at 166 n. 15, 98 S.Ct. at 998 n. 15. The subject matter of environmental regulation, on the other hand, has long been regarded by the Court as particularly suited to local regulation.[6] *Ray* confirms this distinction: "We do not question in the slightest the prior cases holding that enrolled [those engaged in domestic or coastwise trade] and registered [those engaged in foreign trade] vessels must conform to 'reasonable, nondiscriminatory *conservation and environmental protection measures*' ... *imposed by a State.*" 435 U.S. at 164, 98 S.Ct. at 997 (emphasis added) (citations omitted).

As the foregoing discussion makes clear, the holding of *Ray,* which involved a subject matter different from that involved here, cannot be applied mechanically to control the disposition of the present case. Thus, because *Ray* is not dispositive of the preemption issues presented by this case, we must now specifically inquire, as a threshold matter, whether Congress, when it passed the PWSA/PTSA, implicitly intended to occupy the field of regulating the discharge of pollutants from tankers within a state's territorial waters.

■ *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), cautions that "we start with the assumption that the historic police powers of the States were not to be superseded by [federal legislation] unless that was the *clear and manifest* purpose of Congress." 331 U.S. at 230, 67 S.Ct. at 1152 (emphasis added). We must also keep in mind that "[t]he exercise of federal supremacy is not lightly to be presumed." *Schwartz v. Texas,* 344 U.S. 199, 203, 73 S.Ct. 232, 235, 97 L.Ed. 231 (1952). The justification for such caution is that Congress certainly has the power to "act so unequivocally as to make it clear that it intends no regulation but its own." *Rice,* 331 U.S. at 236, 67 S.Ct. at 1155. Furthermore, if we are left with a doubt as to congressional purpose, we should be slow to find preemption, "[f]or the state is powerless to remove the ill effects of our decision, while the national government, which has the ultimate power, remains free to remove the burden." *Penn Dairies v. Milk Control Comm'n,* 318 U.S. 261, 275, 63 S.Ct. 617, 624, 87 L.Ed. 748 (1943). Quoting *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152, the Court in *Ray* noted ways in which congressional intent may manifest itself:

> [The congressional] purpose may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.... Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.

435 U.S. at 157, 98 S.Ct. at 994 (citations omitted).

---

**6.** In another preemption case, albeit one in which the federal legislation contains express nonpreemption language, the Supreme Court specifically acknowledged the importance and appropriateness of state regulation of oil pollution. In *Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973), the Court indicated that it disfavored "allow[ing] federal admiralty jurisdiction to swallow most of the police power of the states over oil spillage—an insidious form of pollution of vast concern to every coastal city or port and to all the estuaries on which the life of the ocean and the lives of the coastal people are greatly dependent." 411 U.S. at 328–29, 93 S.Ct. at 1594.

In our quest to determine whether Congress implicitly intended to occupy the field of regulating pollution caused by tanker deballasting within a state's territorial waters, we first note that on this subject the legislative history of the PWSA/PTSA is silent. But numerous other federal statutes provide convincing evidence of Congress' intent that, within three miles of shore, the protection of the marine environment should be a collaborative federal/state effort rather than an exclusively federal one. The PWSA/PTSA, which deals with a limited category of vessels and pollutants, is of course only a small part of the overall federal marine environmental protection scheme. The heart of the protection scheme is the Clean Water Act, 33 U.S.C. §§ 1251–1376 (1976 & Supp. V 1981) (CWA) (also known as the Federal Water Pollution Control Act or the FWPCA). Enacted contemporaneously with the PWSA, the CWA was designed to regulate the discharge of any pollutant into the nation's navigable waters. Its goal is eventually to eliminate all pollution. 33 U.S.C. § 1251(a)(1). The method of regulation chosen was a permit system known as the National Pollutant Discharge Elimination System (NPDES permit system), 33 U.S.C. § 1342, to be governed by minimum federal standards (effluent limitations), 33 U.S.C. § 1311. Under this system, the states maintain primary responsibility for abating pollution in their jurisdictions; they have authority to establish and administer their own permit systems and to set standards stricter than the federal ones. 33 U.S.C. §§ 1342(b), 1370. The role of the states is made clear by section 1251(b), which says: "It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution . . . ."

In *Pacific Legal Foundation v. Costle*, 586 F.2d 650 (9th Cir.1978), *rev'd on other grounds*, 445 U.S. 198, 100 S.Ct. 1095, 63 L.Ed.2d 329 (1980), this court commented that "there is strong support in the legislative history [of the CWA] for a conclusion that Congress wanted to encourage a federal-state partnership for the control of water pollution. Leg. History at 1279 (comments of Senator Montoya)." 586 F.2d at 657. Thus in the CWA Congress has clearly expressed its intent to allow the states to take an active role in abating water pollution.

This federal/state partnership in pollution regulation applies only to waters within the states' jurisdiction. Generally, the federal marine environmental protection scheme establishes a three-mile demarcation for states' authority over ocean pollution, and for most purposes—including pollution from vessels—the CWA applies only to the ocean within three miles of shore. 33 U.S.C. § 1362(7)–(8), (12).

Pollution beyond the three-mile limit is covered under a number of statutes, the central one being the Marine Protection, Research and Sanctuaries Act, 33 U.S.C. §§ 1401–1444 (1976 & Supp. V 1981) (MPRSA). This law also employs a permit system for ocean dumping but *expressly* preempts state regulation of such dumping while allowing states to propose criteria to the Environmental Protection Agency (EPA). 33 U.S.C. §§ 1402(b), 1416(d).[7]

The above authorities demonstrate a congressional intent that there be joint federal/state regulation of ocean waters within three miles of shore. Such joint regulation undermines the argument that Congress in enacting the PWSA/PTSA implicitly intended to occupy the field of regulat-

---

7. Other federal statutes regulating ocean activity similarly use the three-mile demarcation. *See, e.g.,* Deepwater Port Act, 33 U.S.C. §§ 1501–1524 (1976 & Supp. V 1981) (Coast Guard in charge of deepwater ports outside the three-mile limit, but states given specific veto power over new licenses); Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1882 (1976 & Supp. V 1981) (provides concurrent state and federal jurisdiction within three

miles and exclusive federal jurisdiction beyond); Coastal Zone Management Act, 16 U.S.C. §§ 1451–1464 (1976 & Supp. V 1981) (provides for coordination of federal activities with state approved plans; state waters defined as territorial seas.) *See also Secretary of the Interior v. California*, —— U.S. ——, ——, 104 S.Ct. 656, 658, 78 L.Ed.2d 496 (1984) (territorial seas extend for three geographic miles seaward from coastline).

ing tanker pollution in a state's territorial waters.[8]

Indeed, Congress has shown its high regard for the states' environmental concerns by providing that the CWA, through the NPDES permit system, will enforce state water quality standards stricter than the minimums required by the CWA. The CWA, 33 U.S.C. § 1311(b)(1)(C), requires that "there shall be achieved [within the three-mile limit] ... any more stringent limitation, including those necessary to meet water quality standards ... established pursuant to any state law or regulation ...."

**8.** Appellees argue against reference to the CWA in determining intent under the PWSA/PTSA on the grounds that the CWA is a statute of general applicability only peripherally related to deballasting while the PWSA/PTSA is a more specific and more recent enactment. It is open to debate whether the more specific versus general principle applies when the "general" statute, the CWA, is actually one intended to subject all polluters to a comprehensive, detailed permit process directed at the pollutants sought to be discharged. In any event, principles of construction requiring the more recent and specific statute to prevail over the earlier and more general only apply when there is an irreconcilable conflict between statutes. *Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 1677–1678, 68 L.Ed.2d 80 (1981); *In re Pacific Far East Line, Inc.,* 644 F.2d 1290, 1294 (9th Cir.1981).

Furthermore, the court must seek to harmonize two potentially conflicting statutes: "We must read the statutes to give effect to each if we can do so while preserving their sense and purpose." *Watt v. Alaska,* 451 U.S. at 267, 101 S.Ct. at 1678. This principle has been recently invoked in two of our decisions involving overlapping federal statutes in the areas of environmental regulation and management of marine resources. In *Get Oil Out! Inc. v. Exxon Corp.,* 586 F.2d 726 (9th Cir.1978), we said:

> It is our obligation to so construe federal statutes so that they are consistent with each other, as by this means congressional intent can be given its fullest expression. "[W]hen two statutes are capable of co-existence, it is the duty of the courts ... to regard each as effective." *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 155, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976), *quoting Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474 [2483], 41 L.Ed.2d 290 (1974).

586 F.2d at 729; *see also State of California v. Watt,* 683 F.2d 1253, 1263 (9th Cir.1982), *rev'd on other grounds sub nom. Secretary of the*

Under another provision of the CWA, 33 U.S.C. § 1342(a)(1), a NPDES permit cannot be issued unless the requirements of section 1311 have been met. Further, the regulations implementing section 1342 provide that applicable state water quality standards shall be incorporated into the permit conditions along with other relevant effluent limitations. 40 C.F.R. § 122.62; *see also* 33 U.S.C. § 1341(a)(1); 40 C.F.R. § 124.53(a), (e). Thus, absent preemption by another federal statute, such as the PWSA/PTSA, the Alaska statute at issue in this case is converted by the CWA into a federal standard which the EPA is required to enforce.[9]

*Interior v. California,* —— U.S. ——, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984). Another decision presenting a question of statutory construction similar to the present case is *United States v. Dunn,* 545 F.2d 1281 (10th Cir.1976). There the court construed two federal sentencing provisions, one incorporating state law as the CWA does, and the other providing additional federal sentencing authority. In harmonizing the provisions the court noted:

> The problem is one of construing two statutes, neither enacted in any obvious contemplation of the other but each bearing upon the other when both are involved in the factual situation presented. In such circumstances we should seek a solution which avoids violence to the terms of either but which brings both into correlation, since to construe either in isolation from the other would thwart the intention of Congress.

545 F.2d at 1282.

In the present case, as our opinion demonstrates, the PWSA/PTSA can coexist with the CWA, which adopts Alaska's deballasting statute through the NPDES permit system. Accordingly, we need not turn to those principles of statutory construction allowing one statute to supplant the other.

**9.** In dealing with the CWA the district court and the appellees focused their attention on the oil spill provisions of the statute. The CWA, however, regulates oil pollution under two separate schemes. The first is found in 33 U.S.C. § 1321, a statute specifically aimed at oil spills and their clean-up. The second is the NPDES permit system, 33 U.S.C. §§ 1311, 1342. The permit system more clearly demonstrates Congress' intent that there be federal/state collaboration in the regulation of pollutant discharges within the territorial waters.

Although both the oil spill provisions and the permit provisions of the CWA contain language explicitly stating that state laws are not to be

■ The CWA's non-preemption of Alaska's deballasting prohibition and the CWA's conversion of the prohibition into a federal CWA standard cannot insulate that prohibition against a challenge that it is preempted by the PWSA/PTSA. Nonetheless, the status of such state law under the CWA does provide convincing evidence of a well-settled congressional policy to promote a state's more stringent regulation of the local marine environment. The Supreme Court in *Ray* found that the regulation of the design or size of oil tankers was a subject matter in which there is an "evident congressional intention to establish a uniform federal regime controlling the design of oil tankers." 435 U.S. at 165, 98 S.Ct. at 998. In contrast, our preceding discussion of the CWA demonstrates that Congress has indicated emphatically that there is no

compelling need for uniformity in the regulation of pollutant discharges—and that there is a positive value in encouraging the development of local pollution control standards stricter than the federal minimums.[10]

■ Appellees contend that the comprehensiveness of the PWSA/PTSA provides evidence of preemptive federal intent. But comprehensiveness alone is not enough to demonstrate a federal intent to occupy the entire field. The CWA—which allows concurrent state regulation—is as comprehensive in its regulation of pollution as the PWSA/PTSA is in its regulation of tankers.

As the Court stated in *New York State Dep't of Social Servs. v. Dublino*, 413 U.S. 405, 415, 93 S.Ct. 2507, 2514, 37 L.Ed.2d 688 (1973):

> preempted, 33 U.S.C. §§ 1321(*o*)(2), 1370, as discussed in the text of our opinion, the permit system goes further by providing that any permit granted for discharges within the three-mile limit must incorporate more stringent state water quality requirements.
>
> Moreover, the general NPDES permit requirements apply in addition to any provisions, such as section 1321, governing a specific subject matter—oil discharges. *See United States v. Hamel,* 551 F.2d 107, 109–12 (6th Cir.1977) (general permit provisions of section 1311 apply in addition to specific prohibitions concerning oil discharges contained in section 1321); *cf. Pacific Legal Foundation v. Quarles,* 440 F.Supp. 316 (C.D.Cal.1977) (general permit provisions of section 1311 apply in addition to specific provisions of section 1343 pertaining to ocean pollution), *aff'd sub nom. Kilroy v. Quarles,* 614 F.2d 225 (9th Cir.1980), *cert. denied,* 449 U.S. 825, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980).

**10.** Ordinarily, courts seeking to determine implicit legislative intent confine themselves to the language and legislative history of the statute in question—here, the PWSA/PTSA. Authority exists, however, for looking at the entire federal statutory scheme relative to a particular subject matter, especially when that subject matter is dealt with under a number of separate enactments, some of which were enacted contemporaneously—as were the CWA and the PWSA. For example, in *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), the Supreme Court construed the Equal Employment Opportunity Act and examined congressional intent regarding the continuation of Indian hiring preferences in the Bureau of Indian Affairs by reference to

> two other laws dealing with the same subject matter, but which were contained in different statutes and titles of the United States Code. Another example is *Silkwood v. Kerr-McGee Corp.,* —— U.S. ——, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) where the Supreme Court looked to the legislative history and regulations of the Price-Anderson Act to determine congressional preemptive. intent in the earlier enactment of the Atomic Energy Act.

> Particularly where two federal statutes have overlapping areas of regulation, as do the CWA and PWSA/PTSA, it is permissible and helpful to examine the history and context under which they were enacted. This history and context may include other statutes, executive orders, hearings of legislative committees dealing with the subject matters of regulation, and, as in this case, pertinent international agreements and statutes adopting them. For other examples of the use of such materials in construing ambiguous statutes, see *Silkwood,* —— U.S. at ——, 104 S.Ct. at 622–26; *Watt v. Alaska,* 451 U.S. at 270–73, 101 S.Ct. at 1680–1681; *Morton,* 417 U.S. at 550–55, 94 S.Ct. at 2482–2485; and *City of Burbank v. Lockheed Air Terminal Inc.,* 411 U.S. 624, 644, 93 S.Ct. 1854, 1865, 36 L.Ed.2d 547 (1973).

> In *Ray,* 435 U.S. at 178 n. 28, 98 S.Ct. at 1005 n. 28, the Court rejected an argument that the CWA demonstrates congressional intent for coexistent regulation of tanker design. Unlike *Ray,* this case involves subject matter squarely within the ambit of the CWA and is therefore clearly and properly distinguishable. The *Ray* footnote does not control this case for the same reason that *Ray's* holding does not control this case—*Ray* is specifically and narrowly confined to a different subject matter.

We reject ... the contention that pre-emption is to be inferred merely from the comprehensive character of the federal ... provisions .... The subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem ....

As with the work incentive program considered in *Dublino,* the prevention of harm to the marine environment from oil tanker operations is a complex subject matter in which "a detailed statutory scheme was both likely and appropriate, completely apart from any questions of pre-emptive intent." 413 U.S. at 415, 93 S.Ct. at 2514. Appellees stress that the legislative history of the PWSA/PTSA is clear about the necessity for a "systems" approach to tanker-caused oil pollution, based on a "mix and match" method of balancing and choosing among various regulatory options—some aimed at design, some at traffic control, others at vessel operation. That legislative history, however, may stand equally for the proposition that the problem ·of tanker-caused pollution is complex, must be approached from many angles, and requires a diversity of solutions. S.Rep. No. 724, 92d Cong., 2d Sess. 13–14, *reprinted in* [1972] U.S.Code Cong. & Ad.News 2766, 2773–74. The complexity and comprehensiveness of federal marine environmental regulation are particularly appropriate without regard to the question of preemption because these regulations must "be sufficiently comprehensive to authorize and govern programs in States which had no ... requirements of their own as well as cooperatively in States with such requirements." *Dublino,* 413 U.S. at 415, 93 S.Ct.·at 2514.

Appellees further argue that only "one single decisionmaker" can perform the necessary balancing and choosing in this "mix and match" system of regulation. They rely on that portion of the PWSA/PTSA, 46 U.S.C. § 391a(1)(D), which directs the Coast Guard to perform a cost-benefit analysis by applying "the best available technology ... unless clearly shown to create an undue economic impact which is not outweighed by the benefits ...." The weighing and balancing required in the CWA is, if anything, even more delicate and complex than in the PWSA/PTSA.[11] Yet, in the CWA Congress determined that such decisionmaking could co-exist with the opportunity for states to set stricter standards.

While design standards need to be uniform nationwide so that vessels do not confront conflicting requirements in different ports and so that the Coast Guard can promote international consensus on design standards, there is no corresponding dominant national interest in uniformity in the area of coastal environmental regulation.[12]

---

11. Under the CWA, the EPA must balance costs and benefits, with reference to the following factors set forth in 33 U.S.C. § 1314(b)(1)(B):

Factors relating to the assessment of best practicable control technology currently available to comply with ... Section 1311 of this title [on effluent limitations] shall include consideration of the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, and shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate.

12. Of course, as to environmental regulation of deep ocean waters, the federal interest in uniformity is paramount. Such regulation in most cases needs to be exclusive because the only hope of achieving protection of the environment beyond our nation's jurisdiction is through international cooperation. These considerations do not, however, apply to the waters of the territorial seas which lie within three miles of shore and which can be subject to both federal and state enforcement. The distinguishing factors here are analogous to those considered in the first Supreme Court opinion on preemption:

Now the power to regulate commerce embraces a vast field, containing not only many, but exceedingly various subjects, quite unlike in their nature; some imperatively demanding a single uniform rule, operating equally on the commerce of the United States in every port; and some, like the subject now in question, as imperatively demanding that diversity, which alone can meet the local necessities of navigation.

Here, in fact, the local community is more likely competent than the federal government to tailor environmental regulation to the ecological sensitivities of a particular area.

■ In preemption analysis, we should also consider whether the potential effect of the challenged state statute on international matters gives rise to a preemptive federal interest. In this case, the potential effect of Alaska's deballasting statute on international trade is easily distinguished from the effect of the state tanker design provisions invalidated in *Ray*. Although national uniformity and international consensus are critical concerns in the establishment of tanker design standards, those concerns are not essential in the regulation of pollutant discharges into coastal waters. Once a ship is constructed, it cannot meet new or different design requirements in various ports. A ship's discharge of pollutants can, however, be varied according to environmental standards and conditions in different jurisdictions. Hypothetically,

state regulation regarding the discharge of pollutants could possibly interfere with the establishment of nationally uniform design requirements. But, for the most part local environmental regulations can co-exist—as they do here—with federal regulations without impinging on the exclusively federal concerns of vessel design and traffic safety.[13]

Moreover, the PWSA/PTSA does not mandate strict international uniformity. Although the legislative history of the PWSA/PTSA refers to congressional intent to abide by international agreements regarding the regulation of tankers, S.Rep. No. 724, 92d Cong., 2d Sess. 23, *reprinted in* [1972] U.S.Code Cong. & Ad.News 2788–89, the statute nonetheless gives the Coast Guard specific authority to establish stricter standards than those set by international agreements, 46 U.S.C. § 391a(6). This indicates Congress' view that the international agreements set only minimum standards, that strict international uniformity was unnecessary, and that standards stricter than

*Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851), *quoted in City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624 at 625, 93 S.Ct. at 1855 (1973).

**13.** Consider, for example, the regulation of marine sanitation devices and their discharges under the CWA. Sewage from vessels is one of two specific exemptions from the permit system of the CWA. 33 U.S.C. § 1362(6). Sewage from vessels is exclusively regulated under 33 U.S.C. § 1322. Under this section of the CWA, the EPA, after consulting the Coast Guard, sets standards for the performance of marine sanitation devices. The Coast Guard then promulgates consistent regulations covering design, construction, and operation of such devices. 33 U.S.C. § 1322(b)(1). The Coast Guard has the exclusive authority to regulate these devices, but states are free to determine that their waters require greater protection and may prohibit discharge of any sewage from vessels if the EPA determines that adequate facilities are reasonably available for removal and treatment. 33 U.S.C. § 1322(f)(3). Local prohibition of the discharge of sewage from vessels as allowed by section 1322 has been applied to foreign vessels without adverse results on international trade and has been held not to intrude on the constitutional treaty-making powers of the United States. *Lake Carriers' Ass'n v. Kelley,* 527 F.Supp. 1114, 1130–31

(E.D.Mich.1981), *aff'd,* 456 U.S. 985, 102 S.Ct. 2264, 73 L.Ed.2d 1280 (1982).

We note in passing that in section 1322 Congress carved out an area of regulation otherwise covered by the NPDES permit system, including applicable state standards, and placed part of it within the exclusive domain of the Coast Guard. The fact that Congress did not do the same for the discharge of pollutants from tankers demonstrates its intent to regulate deballasting under both the effluent limitations and permit sections of the CWA (and the state standards incorporated therein) as well as under the PWSA/PTSA.

We repeat that we are not holding that state standards under the CWA could never impermissibly interfere with the Coast Guard's exclusive domain. Even the language of the CWA itself recognizes this possibility by requiring NPDES permits to incorporate Coast Guard regulations regarding the "safe transportation, handling, carriage, storage, and stowage of pollutants." 33 U.S.C. § 1342(g). The general regulatory picture, however, is one of congressionally intended cooperation and collaboration between the Coast Guard and the combined federal/state regulatory authorities under the CWA. *See, e.g.,* 33 U.S.C. § 1321(b)(2)(A), (b)(3), (b)(6)(A) & (b)(6)(B) (allocating division of labor among the various regulatory bodies specified in the CWA provisions on hazardous substances and oil spills).

the international minimums could be desirable in waters subject to federal jurisdiction.

More important to the question at hand, the following legislative history of the Oil Pollution Act Amendments of 1973, Pub.L. No. 93–119, 87 Stat. 424 (OPAA),[14] approving the 1969 amendments to the 1954 International Convention for Prevention of Pollution of the Sea by Oil, expressly refers to the possibility of stricter standards to be set under the CWA. The OPAA announced standards for deballasting near shore identical to the standards subsequently promulgated by the Coast Guard in 1975—the very same standards at issue here. Representative Clausen and Representative Dingell, floor manager of the legislation, specifically discussed the applicability of stricter standards within the three-mile limit of the territorial seas and the exclusivity of Coast Guard regulation beyond three miles.

> MR. CLAUSEN. Mr. Speaker, the next question will relate to enforcement proceedings beyond the territorial sea.
>
> Will this come under the Environmental Protection Act?
>
> MR. DINGELL. No, this will be administered under the statute. We are considering that it will be administered by the Coast Guard, and it will be handled in that fashion.
>
> MR. CLAUSEN. Well, what about on the Continental Shelf itself?
>
> MR. DINGELL. This is within the territorial sea. The Federal Water Pollution Act [CWA] will apply, and they will apply the more stringent standards, so that we could well have application as to vessels, tank and dry cargo and other vessels,

both under international agreement and also under this particular statute.

> MR. CLAUSEN. So for the territorial sea the Environmental Protection Act would control it pretty much?
>
> MR. DINGELL. The Federal Water Pollution Control Act [CWA], as amended would apply.

119 Cong.Rec. 14,588 (1973).

And again in the same debate Representative Clausen stated that the CWA is to apply in conjunction with the federal adoption of international standards:

> Last year, we went as far as we could go by including in the Water Pollution Control Act [CWA] stringent controls prohibiting the discharge of oil in our territorial waters.
>
> . . . .
>
> This bill complements our efforts to control oil pollution within the 3-mile territorial sea by implementing the International Convention for the Prevention of the Pollution of the Sea by Oil.
>
> Through the adoption of this measure we will be prohibiting the discharge of any oil up to 50 miles at sea and more stringently regulating any discharges beyond that distance.
>
> . . . .
>
> Mr. Speaker, this legislation continues the long string of efforts we have made to make certain our water pollution control programs are both continuously updated and responsive to changing needs. In conjunction with the Water Pollution Control Act [CWA] it will help reduce and control pollution and I urge the House to give it overwhelming support.

119 Cong.Rec. 14,590 (1973).[15] Because the CWA incorporates stricter state standards,

14. Although enacted by Congress, the effectiveness of the Oil Pollution Act Amendments of 1973 (OPAA), Pub.L. No. 93–119, 87 Stat. 424, *codified at* 33 U.S.C. §§ 1001–1016 (1976), *repealed and superseded by* Act to Prevent Pollution from Ships, Pub.L. No. 96–478, 94 Stat. 2297, *codified at* 33 U.S.C. §§ 1901–1911 (Supp. V 1981) (enabling legislation of the MARPOL Protocol of 1978), was contingent on ratification of amendments to the international convention by a certain number of nations. The condition was never fulfilled. The substance of the OPAA, however, has been incor-

porated into the MARPOL Protocol of 1978, which the United States ratified by the Act to Prevent Pollution from Ships, Pub.L. No. 96–478, 94 Stat. 2297 (1980), *codified at* 33 U.S.C. §§ 1901–1911 (Supp. V 1981) (the MARPOL Protocol of 1978). The MARPOL Protocol will not become effective until the requisite number of signatory nations have ratified the protocol.

15. *See also The 1973 Inter-Governmental Maritime Consultative Organization Convention on Marine Pollution from Ships [MARPOL]: Hearings Before the Senate Committee on Com-*

this legislative history demonstrates a congressional intent that state regulation of discharges proceed in conjunction with Coast Guard regulation of deballasting within the territorial seas. As the PWSA/PTSA covers subject matter parallel to that covered by the international agreement and amendments that were the focus of the OPAA, the legislative intent expressed by Representatives Clausen and Dingell should be equally applicable to the PWSA/PTSA.[16] Thus, we conclude Congress intended that stricter state standards for oil pollution within three miles of shore be enforced in addition to Coast Guard regulations issued under the PWSA/PTSA.

The above discussion shows that, unlike tanker design features controlled by *Ray*, there is no need for strict uniformity in regulating pollutant discharges into the territorial waters. To the contrary, Congress has repeatedly recognized the need for collaborative federal/state regulation of the marine environment within three miles of shore. Thus, we find that the federal marine environmental protection scheme as a whole does not prohibit stricter state standards regulating water pollution in a state's territorial waters, but in fact, through the CWA, would enforce those standards. Moreover, nothing inherent in the comprehensiveness or complexity of the regulations under the PWSA/PTSA implies a preemptive intent on the part of Congress as to the regulation of deballasting within three miles of shore. Finally, the legislative history of the OPAA, the statute which embodied congressional approval of the 1969 amendments to the 1954 International Convention for Prevention of Pollution of the Sea by Oil, contains express floor debate remarks that stricter standards under the

CWA are to apply within three miles of shore. We therefore hold that, in enacting the PWSA/PTSA, Congress did not implicitly intend to occupy the field of regulating discharges of pollutants from tankers into a state's territorial waters.

## II. Is the Alaska Statute Void Because it Actually Conflicts with the PWSA/PTSA and Implementing Coast Guard Regulations?

 Having found that Congress did not intend complete occupation of the field of regulating pollution from oil tankers within a state's territorial waters, we now address the question whether Alaska Stat. § 46.03.750(e) is void because it actually conflicts with the PWSA/PTSA and implementing Coast Guard regulations.

Even if Congress has not completely foreclosed state legislation in a particular area, a state statute is void to the extent that it *actually conflicts* with a valid federal statute. A conflict will be found "where compliance with both federal and state regulations is a physical impossibility . . . ," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or where the state "law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) . . . .

*Ray,* 435 U.S. at 158, 98 S.Ct. at 994 (emphasis added) (other citations omitted). The question is whether there is an "irreconcilable conflict between the federal and state standards." *Silkwood v. Kerr-McGee*

---

*merce,* 93d Cong., 1st Sess. 9 (1973) (comments of former EPA Administrator Russell Train):

 [W]ith respect to discharges, the United States believes it is important because of its own high standards to maintain the freedom of action to establish higher standards under the Federal Water Pollution Control Act [CWA] if it desires.

This provides a clear statement that the EPA recognizes, even after passage of the PWSA, that oil pollution from tankers is subject to regulation under the CWA.

**16.** The legislative history of the PWSA/PTSA establishes that it is based in large part on MARPOL and the MARPOL Protocol (which incorporated the deballasting standards of the OPAA), and is intended to be construed consistently with them, except where expressly stated to the contrary. H.R.Rep. No. 1384, 95th Cong., 2d Sess. 21, *reprinted in* [1978] U.S.Code Cong. & Ad.News 3270, 3289.

*Corp.,* —— U.S. ——, ——, 104 S.Ct. 615, 626, 78 L.Ed.2d 443 (1984). *Merrill Lynch, Pierce, Fenner & Smith v. Ware,* 414 U.S. 117, 126, 94 S.Ct. 383, 389, 38 L.Ed.2d 348 (1973), cautions us that in conducting our inquiry we must be "mindful ... of the purposes behind" the potentially conflicting statutes:

> [W]e may not overlook the body of law relating to the sensitive interrelationship between statutes adopted by the separate, yet coordinate, federal and state sovereignties. Our analysis is also to be tempered by the conviction that the proper approach is to reconcile "the operation of both statutory schemes with one another rather than holding one completely ousted."

414 U.S. at 127, 94 S.Ct. at 389–390, *quoting Silver v. New York Stock Exchange,* 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963). Moreover, state law should be preempted " 'only to the extent necessary to protect the achievement of the aims of the [federal act in question].' " *Merrill Lynch,* 414 U.S. at 127, 94 S.Ct. at 390, *quoting Silver,* 373 U.S. at 361, 83 S.Ct. at 1259.

As required by *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), we first proceed to determine whether the legislative objectives of the PWSA/PTSA clash with those of Alaska's deballasting statute adopted by the CWA through the NPDES permit system. The purpose of both the Alaska deballasting prohibition and the CWA is the same: to eliminate damage to the marine environment from the discharge of pollutants into the nation's waters. Several places in the legislative history of the CWA refer to a "no discharge policy" or "zero-discharge goal." S.Rep. No. 414, 92d Cong., 2d Sess. (1971), *reprinted in* [1972] Code Cong. & Ad.News 3668, 3676; S.Conf.Rep. No. 1236, 92d Cong., 2d Sess. (1972), *reprinted in* [1972] Code Cong. & Ad.News 3668, 3777. The preamble of the CWA establishes that "it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." 33 U.S.C. § 1251(a)(1). As the House Report stated

in discussing the effluent limitations section: "Any discharge of a pollutant without a permit ... is unlawful." H.R.Rep. No. 911, 92d Cong., 2d Sess. 100 (1972), *quoted in Natural Resources Defense Council, Inc. v. Costle,* 568 F.2d 1369, 1374 (D.C.Cir.1977). Similarly, the Senate Report stated that 33 U.S.C. § 1311

> clearly establishes that the discharge of pollutants is unlawful. Unlike its predecessor program which permitted the discharge of certain amounts of pollutants ... this legislation [CWA] would clearly establish that no one has the right to pollute—that pollution continues because of technological limits, not because of any inherent rights to use the nation's waterways for the purpose of disposing of wastes.

S.Rep. No. 414, 92d Cong., 2d Sess. 42 (1971), *reprinted in* [1972] U.S.Code Cong. & Ad.News 3678, 3709, *quoted in Costle,* 568 F.2d at 1374–75.

Alaska's and the CWA's goal of protecting the ecological integrity of the territorial waters is entirely compatible with the purposes of the PWSA/PTSA as they relate to protection of the marine environment from the discharge of pollutants. Insofar as it assigns the Coast Guard the duty to regulate deballasting, the PWSA sought "to reduce damage to the marine environment by normal vessel operations such as ballasting and deballasting ...." 46 U.S.C. § 391a(7) (1976); *see* 46 U.S.C. § 391a(6)(A)(vii) (Supp. V 1981). As stated in the Senate Report on the PWSA, that Act was

> urgently needed legislation to cope with the increasing safety hazards of maritime transportation and with pollution resulting from operation and casualties of vessels carrying oil or other hazardous substances in bulk. Comprehensive legislation is needed to protect our coastal waters and resources including fish, shellfish, wildlife, marine and coastal Eco systems [sic] and recreational and scenic values. What is most urgently needed is legislation that will put the emphasis on *prevention,* and that is the thrust of H.R. 8140 [PWSA], as amended.

S.Rep. No. 724, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 2768–69 (emphasis in original). After the PWSA was passed, congressional dissatisfaction with measures to protect the environment continued, as evidenced in the House Report on the PTSA, quoted in part as follows:

> Since the 1972 amendment of the Tank Vessel Act, the Coast Guard has proceeded rather slowly with the implementation of the revised provisions. On occasion, proposed regulations have been criticized as weak and ineffective, and the Coast Guard's reluctance to proceed expeditiously has resulted, in at least one occasion, in a law suit by environmental interests to mandate more rapid implementation by the Coast Guard.

H.R.Rep. No. 1384—Part I, 95th Cong., 2d Sess. 5, *reprinted in* [1978] U.S.Code Cong. & Ad.News 3270, 3273.

 To establish firmer controls to protect the environment, the PTSA was passed in 1978 with this strong policy statement:

(A) that the carriage by vessels of certain cargoes in bulk or in residue creates substantial hazards to life, property, the navigable waters of the United States (including the quality thereof) and the resources contained therein and to the adjoining land, including but not limited to fish, shellfish, and wildlife, marine and coastal ecosystems, and recreational and scenic values;

(B) that *existing standards* for the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of all such vessels which use any port or place subject to the jurisdiction of the United States or which operate in the navigable waters of the United States *must be more stringent and comprehensive for the mitigation of the hazards to life, property, and the marine environment.*

46 U.S.C. § 391a(1)(A)–(B) (emphasis added). Thus, the history of congressional action with regard to tankers demonstrates increasingly stringent protection of the marine environment.[17] Where both the legislative schemes of the PWSA/PTSA and the Alaska deballasting regulation as adopted by the CWA "reflect a policy choice favoring" the same goal—here the elimination of harmful ocean pollution—the court should be reluctant to infer preemption. "[I]t would be particularly inappropriate ... because the basic purposes of the state statute and the [federal] Act are similar." *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 132, 98 S.Ct. 2207, 2217, 57 L.Ed.2d 91 (1978); *accord William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1050 n. 62 (9th Cir.1981).[18]

---

17. Certainly the Alaska deballasting prohibition and the CWA provide a more absolute prohibition on pollutants than the PWSA/PTSA. But we must bear in mind that the Alaska prohibition and CWA are limited to the narrow three-mile band of coastal waters, and that the PWSA/PTSA must also deal with the high seas where the United States acts as a party to international agreements, rather than as a sovereign setting its own standards. *See supra* note 12.

18. Appellees argue at length that the Alaska deballasting law has the same purpose as the PWSA/PTSA and that such coincidence leads inevitably to the conclusion of preemption. Similarity of purpose is listed as a test of preemption in *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Coincidence of purpose, however, does not necessarily determine the preemption issue. As the Court stated in *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963):

> [I]t is suggested that the coexistence of federal and state regulatory legislation should depend upon whether the *purposes* of the two laws are parallel or divergent. This Court has, on the one hand, sustained state statutes having objectives virtually identical to those of federal regulations, *California v. Zook,* 336 U.S. 725, 730–731 [69 S.Ct. 841, 843–844, 93 L.Ed. 1005]; *cf. De Veau v. Braisted,* 363 U.S. 144, 156–157 [80 S.Ct. 1146, 1152–1153, 4 L.Ed.2d 1109]; *Parker v. Brown,* 317 U.S. 341 [63 S.Ct. 307, 87 L.Ed. 315]; and has, on the other hand, struck down state statutes where the respective purposes were quite dissimilar, *First Iowa Hydro-Electric Cooperative v. Federal Power Comm'n,* 328 U.S. 152 [66 S.Ct. 906, 90 L.Ed. 1143]. The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives.

In examining the potential for conflict between the Alaska statute and the Coast Guard regulations under the PWSA/PTSA, we note at the outset that the state law prohibits acts that the federal regulations allow but do not require. That is, Coast Guard regulations allow the deballasting of "clean" ballast from cargo tanks, but do not require it. As we have stated, "[T]he possibility of proscription by [a state] of conduct that federal law might permit is not sufficient to warrant preemption." *William Inglis,* 668 F.2d at 1049; *see Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).[19] A finding of preemption is partic-

ularly inappropriate when the state is regulating conduct permitted by federal regulation, but only as an exception to a broad federal prohibition. *Exxon Corp. v. Governor of Maryland,* 437 U.S. at 132, 98 S.Ct. at 2217. As discussed *supra* at pp. 581, and 590–592, the Coast Guard's deballasting regulations are based on those adopted by a 1969 international convention. The terms of these deballasting rules as adopted by Congress in the 1973 OPAA establish clearly that the goal was to eliminate deballasting from cargo tanks within fifty miles of shore, with an exception carved out only for ballast that had been stored in a cleaned tank.[20]

If this court had found as a threshold determination that the national interest in exclusively regulating the discharge of pollutants from tankers into the territorial waters was so pervasive and dominant that the federal government had occupied the field, then a finding of preemption would follow because the state regulation would "impair the federal superintendence of the field." Thus in *Ray,* once the Court found that "Congress intended uniform national standards for design and construction of tankers," it followed that the Washington State safety measures were void because they aimed "precisely at the same ends" as did "[t]he federal scheme." 435 U.S. at 163, 165, 98 S.Ct. at 997, 998. Similarly, in *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 638–39, 93 S.Ct. 1854, 1862, 36 L.Ed.2d 547 (1973), the Court, having found that the "peculiarities and special features" of the aviation regulatory scheme require "a uniform and exclusive system of federal regulation," did not allow a minor local encroachment of excluding one night flight to a federally regulated airport.

In the present case, however, this court has held that under the PWSA/PTSA Congress did not intend to exclude completely state laws prohibiting pollutant discharges from tankers into the territorial waters of a state. As the *Exxon* and *Inglis* cases teach, in an area of collaborative federal and state regulation, coincidence of purpose actually militates against, rather than in favor of, preemption. "Where the Government has provided for collaboration the courts should not find conflict." *Union Brokerage Co. v. Jensen,* 322 U.S. 202, 209, 64 S.Ct. 967, 972, 88 L.Ed. 1227 (1944), *quoted in Merrill Lynch, Pierce, Fenner & Smith,* 414 U.S. at 137, 94 S.Ct. at 395; *accord Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974); *New York State Dep't of Social Servs. v. Dublino,* 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973).

**19.** While state prohibition of conduct allowed by federal regulation may sometimes be pre-

empted, such a conclusion requires greater evidence of preemptive intent than that present in this case. In *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), the Court held that a California prohibition against due-on-sale mortgage clauses was preempted because federal regulations allowed federally chartered savings associations to use those clauses. There the federal agency had "unequivocally expresse[d] the ... determination to displace state law," based on its finding that the use of due-on-sale clauses was "critical to 'the financial stability of'" the regulated institutions. 458 U.S. at 156, 102 S.Ct. at 3024 (citations omitted). By contrast, in the present case, while the Coast Guard apparently considered but chose not to impose a total prohibition on deballasting from cargo tanks, it did not make any specific findings that as to Alaskan waters such prohibition would seriously affect vital concerns for the safety of vessels or the environment. Here also, unlike *de la Cuesta,* the state is merely eliminating one exception to a general federal prohibition, rather than asserting authority over an area in direct conflict with overriding federal policy. In short, the state's deballasting prohibition coincides with the general federal policy that prohibits deballasting from cargo tanks except under very limited conditions.

**20.** 33 U.S.C. §§ 1002 and 1004 were amended in 1973 by the OPAA to read as follows:

Sec. 1002. Subject to the provisions of sections 1003 and 1004 of this title, the discharge of oil or oily mixture from a ship is prohibited unless—

. . . .

(2) for a tanker, except discharges from machinery space bilges which shall be governed by the above provisions for ships other than tankers—

(i) the total quantity of oil discharged on a ballast voyage does not exceed one fifteen-

The history of regulation under the PWSA/PTSA and the adoption of new international standards show a continuing effort to reduce the discharge of ballast from cargo tanks. The 1973 MARPOL and regulations under the PWSA required all new vessels over 70,000 DWT (deadweight tons) to have segregated ballast tanks, and the vessels were prohibited from storing ballast in cargo tanks unless required by emergency weather conditions. 33 C.F.R. §§ .157.-09(a), 157.35. The 1978 MARPOL Protocol extended the requirements to all new tankers over 20,000 DWT. Existing tankers over 40,000 DWT were required either to retrofit with segregated ballast tanks or to install a crude oil washing system. The PTSA increased the requirements as to existing tankers by imposing them on all tankers over 20,000 DWT. 46 U.S.C. § 391a(7)(A). In enacting the PTSA, Congress specifically ordered the Coast Guard to undertake "the reduction or elimination of discharges during deballasting . . . ." 46 U.S.C. § 391a(6)(A)(vii). In the context of the general prohibition against cargo tank discharges within fifty miles of shore and the repeated changes in design requirements aimed at eliminating cargo-tank ballasting, it is difficult to argue convincingly that the Congress or the Coast Guard intended to create a federal right to discharge ballast containing oil into a state's coastal waters. *See Exxon Corp. v. Governor of Maryland,* 437 U.S. at 132, 98 S.Ct. at 2217.

Although we conclude that the objectives of the Alaska statute do not conflict with those of the Coast Guard regulations under the PWSA/PTSA, we must nevertheless determine whether the facts of this case as alleged or conceded by appellees reveal an irreconcilable conflict when the Alaska statute and Coast Guard regulations are applied concurrently in Alaska territorial waters. Here again we must be guided by the Court's reluctance to entertain hypothetical conflicts because "[i]n this as in other areas of coincident federal and state regulation, the 'teaching of this Court's decisions . . . enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists.' " 437 U.S. at 130, 98 S.Ct. at 2216, *quoting Seagram & Sons v. Hostetter,* 384 U.S. 35, 45, 86 S.Ct. 1254, 1261, 16 L.Ed.2d 336 (1966) (citations omitted).

No party asserts that it is physically impossible to comply with both the Alaska statute and the relevant Coast Guard regulations. Furthermore, the Alaska statute was amended in 1980 to make clear that it would not apply in cases where safety reasons dictated non-compliance. Alaska Stat. § 46.03.750(a)–(b).[21] Appellees argue that the Alaska regulation nevertheless conflicts with the PWSA/PTSA because it interferes with the delicate, cost-effective balance the Coast Guard has achieved among design

thousandths of the total cargo-carrying capacity, and
(ii) the tanker is more than fifty miles from the nearest land.
Sec. 1004. Section 1002 of this title does not apply to the discharge of tanker ballast from a cargo tank which, since the cargo was last carried therein, has been so cleaned that any effluent therefrom, if it were discharged from a stationary tanker into clean calm water on a clear day, would produce no visible traces of oil on the surface of the water. 33 U.S.C. §§ 1002, 1004 (1976), *repealed and superseded by* 33 U.S.C. §§ 1901–1911 (Supp. V 1981) (enabling legislation of the MARPOL Protocol).
As described in the House Report to Pub.L. No. 96–478 (enacting the 1978 MARPOL Protocol), these 1969 international deballasting standards, codified at 33 U.S.C. §§ 1002, 1004, "generally prohibited all discharges from tankers within 50 miles of land." H.R.Rep. No.

1224, 96th Cong., 2d Sess. 3, *reprinted in* [1980] U.S.Code Cong. & Ad.News 4849, 4850.

**21.** (a) Except as provided in (b) of this section, a person may not cause or permit the discharge of ballast water from a cargo tank of a tank vessel into the waters of the state. A tank vessel may not take on petroleum or a petroleum product or by-product as cargo unless it arrives in ports in the state without having discharged ballast from cargo tanks into the waters of the state and the master of the vessel certifies that fact on forms provided by the department.
(b) The master of a tank vessel may discharge ballast water from a cargo tank of his tank vessel if it is necessary for the safety of the tank vessel and no alternative action is feasible to assure the safety of the tank vessel.
Alaska Stat. § 46.03.750(a)–(b).

and operational features by rendering some of the most expensive equipment, such as crude oil washing systems, superfluous. According to the affidavits submitted to the district court, the typical practice of tankers is to discharge dirty ballast beyond fifty miles, clean the tanks, take on new ballast and then discharge this "clean" ballast in port. If on-shore treatment is required then arguably this two-step operation could be avoided and thus such design features as tank-washing equipment may be unnecessary. There appears to be room, however, for both the PWSA/PTSA and Alaska's deballasting regulations to operate purposefully. The tank-washing equipment would still be necessary for vessels entering ports in other states which do not have a cargo-tank deballasting prohibition. *See Dublino,* 413 U.S. at 415, 93 S.Ct. at 2514. Furthermore, the legislative history of the bill enacting the 1978 MARPOL Protocol establishes the importance of crude oil washing systems even where there are segregated ballast tanks, because sludge builds up in the cargo tanks and reduces the amount of deliverable cargo. H.R.Rep. No. 1224, 96th Cong., 2d Sess. 5–6, *reprinted in* [1980] U.S. Code Cong. & Ad.News 4849, 4852. The tank-cleaning features could serve the further purpose of protecting the waters within fifty miles of shore from environmental damage that might be caused if ballast

were released from a cargo tank during an emergency or accident. Finally, the tankers calling on Alaska's ports also may apply to the Coast Guard under 46 U.S.C. § 391a(7)(N) for exemptions from the required design features on the basis that adequate on-shore facilities exist to process all ballast water.[22]

Appellees further argue that the Alaska statute conflicts with the PWSA/PTSA because it is an indirect design feature. Unlike the Washington State statute considered in *Ray,* Alaska has neither set out any required design features, nor has it even sought to impose different conditions on vessels not meeting preferred design criteria (as was held permissible under Title I of the PWSA by the Court in *Ray,* 435 U.S. at 173, 98 S.Ct. at 1002). Similar to the division of regulatory authority in 33 U.S.C. § 1322, discussed *supra* at note 13, Alaska has left all designing of vessels and equipment to the Coast Guard and has only prohibited the discharge of polluted ballast. While this requirement may impose some financial burden on the regulated vessels and require their owners to make some economic choices in order to comply, such a burden neither converts the discharge prohibition into a design feature nor justifies a finding of federal preemption.[23]

---

**22.** A similar superfluity argument was raised under the CWA in *Pacific Legal Foundation v. Quarles,* 440 F.Supp. 316 (C.D.Cal.1977), aff'd sub nom. *Kilroy v. Quarles,* 614 F.2d 225 (9th Cir.1980), cert. denied, 449 U.S. 825, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980). The CWA imposes two sets of criteria on ocean pollution: the first is the general effluent limitations and NPDES permit system; the second is a section specially referring to ocean pollution that prohibits any discharges that would "unreasonably degrad[e] the ocean environment." 440 F.Supp. at 324; *see* 33 U.S.C. § 1343 (1976). In *Pacific Legal Foundation,* the plaintiffs argued that only the latter section should be applied since the strict "secondary treatment" standard required under the general effluent limitations and permit sections would render the looser specialized ocean pollution criteria "comparatively useless" in most cases. 440 F.Supp. at 324. As in this case, Congress neglected to specify how these two environmental laws were to relate to each other. The court found that a limited role for the latter section could

still exist and, after examining the legislative history, ruled that, considering the strength of congressional intent to eliminate pollution and the absolutist nature of the permit system's coverage, Congress intended both sets of criteria to apply concurrently. 440 F.Supp. at 322–26.

**23.** Currently all tankers, except the *Alaska Standard,* using Alaskan ports are discharging cargo-tank ballast into on-shore processing facilities. Appellees attempt to convince us that the Alaska law effectively excludes the *Alaska Standard* from the state's waters because of a disfavored design feature that makes it difficult for the vessel to comply with the state's deballasting provision. The district court never reached this issue because it found that the PWSA/PTSA had preempted the field. Although there was some factual dispute at the district court over the relative merits and costs of alternative methods of compliance with the Alaska deballasting prohibition, even appellees concede that a range of alternatives exists,

Finally, appellees and amicus argue that Alaska is unique in its ability to process ballast because of the existence of a huge, expensive processing facility at Valdez, built as part of the legislative compromise which allowed the Trans-Alaska pipeline to be constructed. They argue that other states do not have such large on-shore treatment capacity and that the Coast Guard has adopted its regulation allowing deballasting from cargo tanks because an across-the-board on-shore processing requirement would severely overload facilities in many areas of the country. 42 Fed.Reg. 32,671 (1977).[24] Although these considerations might lead to a different analysis in a future case dealing with another state's regulations, they are inapplicable here because Alaska has expansive on-shore processing facilities and no party has complained that enforcement of Alaska's deballasting regulation would cause the facilities to be overloaded.

We are guided here by the principles set forth in *Pacific Legal Foundation v. State Energy Resources, Conservation & Dev. Comm'n,* 659 F.2d 903 (9th Cir.1981), *aff'd sub nom. Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* —— U.S. ——, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983):

> In applying preemption analysis, we "distinguish those situations in which the concurrent exercise of a power by the Federal Government and the States ... *may possibly* lead to conflicts and those situations where conflicts *will necessarily* arise." *Goldstein v. California,* 412 U.S. 546, 554 [93 S.Ct. 2303, 2308, 37 L.Ed.2d 163] .... There is no necessary conflict between [the state law under consideration] and federal law, and it will be time

to consider any future conflicts if and when they arise.

659 F.2d at 925 n. 35 (citations omitted) (emphasis in original).

CONCLUSION

Having determined that Congress did not intend to preclude all state regulation of the discharge of pollutants from tankers within three miles of shore, and finding no irreconcilable conflict between the regulation of deballasting under the PWSA/PTSA and the Alaska deballasting statute under the facts presented by appellees, we conclude that the Alaska statute may co-exist with Coast Guard regulations. Accordingly, the judgment of the district court is reversed insofar as it holds that the prohibition of discharge of ballast from cargo tanks into state territorial waters under Alaska Stat. § 46.03.750(e) is preempted by federal regulation and void under the Supremacy Clause of the United States Constitution.

This case is REVERSED and REMANDED to the district court with instructions to enter summary judgment in favor of appellants on the preemption issue presented in this appeal.

---

more than one of which would allow the *Alaska Standard* to continue to make all of its ports of call in Alaska. For example, its owner could build an on-shore processing facility at each port it visits, or could pump ballast onto a barge for transportation and later processing at an existing facility, or could retrofit the *Standard* with segregated ballast tanks.

**24.** The only other evidence of this potential conflict that appellees present is an assertion by the Coast Guard in an Environmental Impact Statement, not made available to this court, voicing a similar concern regarding the adequacy and availability of on-shore processing facilities in some jurisdictions, but apparently lacking specific reference or findings as to Alaska.