PACIFIC MERCHANT SHIPPING ASSOCIATION; American Institute of Merchant Shipping; Offshore Marine Service Association; Western Oil and Gas Association; Clean Seas, Plaintiffs–Appellees,

v.

Lloyd W. AUBRY, Jr., Labor Commissioner, Division of Labor Standards Enforcement, Department of Industrial Relations, State of California, Defendant–Appellant,

v.

TIDEWATER MARINE SERVICE, INC.; Western Boat Operators, Inc., Plaintiff/Intervenors–Appellees.

No. 89–55379.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 5, 1990.

Decided Nov. 13, 1990.

H. Thomas Cadell, Jr., Dept. of Indust. Relations, San Francisco, Cal., for defendant-appellant.

Thomas E. Hill, Musick, Peeler & Garrett, Los Angeles, Cal., for plaintiffs-appellees.

Michael M. Johnson, McCuthen, Black, Verleger & Shea, Los Angeles, Cal., for plaintiff/intervenors-appellees.

John Schnitker, U.S. Dept. of Justice, Washington, D.C., for amicus, U.S.

Before BROWNING and PREGERSON, Circuit Judges, and COPPLE, District Judge.[*]

PREGERSON, Circuit Judge:

Lloyd W. Aubry ("Aubry"), California's labor commissioner, enforced California's overtime pay laws against Clean Seas, an employer operating vessels off the California coast. Pacific Merchant Shipping Association and other shipping associations [1] ("PMSA") brought suit in the district court on behalf of Clean Seas and other member companies, seeking declaratory and injunctive relief on the ground that California's overtime pay laws are preempted by federal admiralty law. Tidewater Marine Service, Inc., and Western Boat Operations, Inc. ("Tidewater") intervened in the action after an employee filed an overtime wage claim with the California Division of Labor Standards Enforcement. The district court

---

[*] The Honorable William P. Copple, Senior United States District Judge, District of Arizona, sitting by designation.

[1] American Institute of Merchant Shipping; Offshore Marine Service Association; Western Oil and Gas Association.

granted summary judgment for PMSA and Tidewater, declared Aubry's actions preempted by federal admiralty law, and enjoined further enforcement of California's overtime pay laws against Clean Seas, Tidewater, and other maritime employers. *Pacific Merchant Shipping Ass'n v. Aubry*, 709 F.Supp. 1516 (C.D.Cal.1989). We have jurisdiction over the district court's final order under 28 U.S.C. § 1291. We reverse.

## BACKGROUND

### I. Admiralty Terminology

At the outset, and for the sake of clarity, we explain basic admiralty terminology used by the district court and in this opinion.

### A. *Maritime Employees:*

■ Historically, those who work on ships have been called "seamen." As a matter of general maritime law, the term "seamen" includes a broad range of marine workers whose work on a vessel on navigable waters contributes to the functioning of the vessel, to accomplishment of its mission, or to its operation or welfare. *See* 46 U.S.C. § 10101(3); Norris, *The Law of Seamen*, §§ 2.1, 2.3, 2.10 (4th ed. 1985). "Seamen" is also used, in a much narrower sense, in the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, to define a category of maritime workers *exempted* from coverage under federal overtime pay provisions. *See* 29 U.S.C. § 213(b)(6).[2] Under federal regulations, a "seaman" exempted from the FLSA's overtime pay provisions is one who works "primarily as an aid in the operation of [a] vessel as a means of transportation, provided he performs no substantial amount of work of a different character." *See* 29 C.F.R. § 783.31 (1989). A "substantial amount of work of a different character" is more than 20 percent of the time worked by an employee during any given work week. 29 C.F.R. § 783.37 (1989).

This appeal involves workers who are FLSA-exempt "seamen" and workers who, while not exempted from the FLSA's overtime pay provisions, are still "seamen" in the broader, general sense. Because the distinction is important, and to avoid confusion, we use the following terms to describe the employees affected by this opinion: a "maritime employee" is a "seaman" in the general maritime sense; and a "seaman" is a maritime employee exempted from the FLSA's overtime pay provisions under 29 U.S.C. § 213(b)(6).

### B. *Seas:*

Two zones of "navigable waters" are involved in this appeal. The "territorial sea" is the sea from shore to three nautical miles off shore. The "high seas" are ocean waters outside the territorial sea, i.e., more than three miles offshore.

### C. *Voyages:*

The Shipping Act, 46 U.S.C. §§ 2101–14701, divides "voyages" into three types. "Foreign voyages" are voyages between ports in the United States and ports in foreign countries (except Canada, Mexico, and the West Indies). *See* 46 U.S.C. § 10301(a)(1). "Intercoastal voyages" are voyages between ports on the Atlantic and Pacific coasts. *See* 46 U.S.C. § 10301(a)(2). "Coastwise voyages" are voyages "between a port in one State and a port in another State (except an adjoining State)." *See* 46 U.S.C. § 10501(a). United States Coast Guard regulations define "coastwise vessels" as those "normally navigating the waters of any ocean or the Gulf of Mexico 20 nautical miles or less offshore." 46 C.F.R. § 70.10–13 (1988).

### II. Facts and Procedural History

PMSA and the other associations involved in this appeal are maritime trade

---

**2.** Under the FLSA, with certain exceptions, all hours worked in excess of 40 hours per week must be compensated at "a rate not less than one-and-one-half times the regular rate." 29 U.S.C. § 207(a)(1). The statute also provides in relevant part:

The provisions of section 207 of this title shall not apply with respect to—

(6) any employee employed as a seaman....

29 U.S.C. § 213(b).

associations that represent merchant maritime shippers, other maritime employers, and employers in the oil and gas industry. Among these organizations' members are Clean Seas and Tidewater. Clean Seas is an unincorporated, cooperative association, formed by several major oil companies to contain and clean up marine oil spills off the California coast. Tidewater provides offshore transportation and support services worldwide, and provides transportation services to oil drilling platforms from one to 12 nautical miles of the California coast.

Clean Seas operates three vessels: *Mr. Clean, Mr. Clean II,* and *Mr. Clean III.* The employees whose wage claims led to this appeal work on *Mr. Clean II* and *Mr. Clean III* (three on *Mr. Clean II;* nine on *Mr. Clean III*). Both vessels' duties involve control and clean up of oil spills and other environmentally hazardous discharges in the Santa Barbara Channel off the California coast. *Mr. Clean II* is a 138-foot vessel moored in Port San Luis Harbor, California, where it remains moored approximately one-quarter mile offshore about 90 percent of the time. *Mr. Clean III* is a 181-foot vessel permanently stationed on the high seas off the California coast. *Mr. Clean III* conducts containment and clean up operations around four oil drilling and production platforms over the Pedernales and Arguello oil fields, from four to ten nautical miles off the California coast. When not on active duty, *Mr. Clean III* is tied to a buoy approximately seven miles off the California coast.

Cleans Seas employees who work on *Mr. Clean III* are organized into two crews of six.[3] Each crew works seven day "hitches" at sea, alternating with seven day rest periods on shore. While at sea, Clean Seas employees typically work 12 hour shifts, alternating with 12 hour rest periods. *Mr. Clean III* crew members are transported to the vessel by helicopter from the Santa Barbara Airport. Of the 12 Cleans Seas employees involved in the underlying action, two were licensed "mates" and ten, who worked primarily on clean up operations, were certified as "seamen" by the United States Coast Guard.[4] The specific terms of Clean Seas' employees' work are usually set out in contracts negotiated between each employee and Clean Seas.

Tidewater operates two types of vessels off the California coast. Tidewater's supply boats are 180- to 190-foot vessels with seven-member crews that pick up and deliver cargo at the Port Hueneme Pier, south of Santa Barbara, for delivery at various offshore oil platforms. Tidewater's crew boats are 65-foot vessels with two-member crews that transport passengers, light supplies and mail from the Carpinteria and Ellwood piers, also near Santa Barbara, to offshore oil platforms. These vessels are on call at all times. When a vessel is called, it goes to a pier to pick up cargo or passengers, travels to its destination, and then returns to the pier.

The employee whose wage claim led to Tidewater's intervention in this action was a deck engineer on a crew boat. The parties agree that the employee is a seaman exempted from the FLSA's overtime provisions under 29 U.S.C. § 213(b)(6). Typical-

---

3. The record does not indicate whether *Mr. Clean II* crewmembers are organized this way.

4. Under applicable federal regulations, the United States Coast Guard inspects vessels and issues certificates to qualifying maritime employees. *See* 46 C.F.R. §§ 71.01–71.75 (1988). A "mate" is a "qualified officer in the deck department other than the master." 46 C.F.R. § 10.103 (1989). Marine employees are certified as "seamen" upon meeting a range of age and training requirements. 46 C.F.R. §§ 12.-01–1 to 12.25–40 (1989). Certification as a "seaman" under Coast Guard regulations does not bear on an employee's status as a "seaman" for purposes of exemption from federal overtime

laws under 29 U.S.C. § 213(b)(6). *See* 29 C.F.R. 783.31–.37 (1989).

The district court made no findings on the question whether Clean Seas' employees were FLSA-exempt seamen. That question is one of fact, and must be decided by the district court. *Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 *on remand, Worthington v. Icicle Seafoods, Inc.,* 796 F.2d 337 (9th Cir.1986). In this case, however, because we hold that California may apply its overtime provisions to both the FLSA-exempt seamen and the non-exempt maritime employees involved in this suit, we need not remand the case to the district court to determine the status of Clean Seas' employees.

ly, Tidewater crew boat crews work 7 day hitches alternating with 7 day rest periods onshore; employees work 12 hour shifts alternating with 12 hour rest periods. The specific terms of most Tidewater crew members' work are set out in employment contracts negotiated between individual employees and Tidewater.

The record indicates that all the Clean Seas employees and the Tidewater employee are California residents who live in California when not on board ship. The workers are hired in California, receive paychecks at California addresses, and pay California taxes.

In 1987, the twelve Clean Seas employees filed claims for unpaid overtime compensation with the California Labor Commissioner. The California Labor Code grants the Labor Commissioner authority to enforce Wage Orders issued by the California Industrial Welfare Commission ("IWC"). *See* Cal.Lab.Code §§ 98, 1173. IWC Wage Order 4-80 sets out wage and overtime requirements with respect to "professional, technical, clerical, mechanical, and similar occupations." Cal.Code Regs. § 11345(2)(c). After a hearing, Aubry applied Wage Order 4-80 to the Clean Seas crewmembers and granted an average of $45,000 in back wages to each of the 12 Clean Seas employees. PMSA then filed the complaint for declaratory and injunctive relief underlying this appeal. Meanwhile, in February 1988, Frank Kleman, the Tidewater employee, filed a claim for $50,000 unpaid overtime compensation (for a 12-month period) with the California Labor Commission. Tidewater then intervened in PMSA's federal court action. Kleman's case and all other similar administrative claims were stayed pending the outcome of the federal court action.

After a hearing on cross-motions for summary judgment, the district court granted PMSA and Tidewaters' request for declaratory and injunctive relief, holding that California cannot apply its overtime provisions to maritime employees employed primarily on the high seas or to seamen. 709 F.Supp. at 1526. The district court enjoined all enforcement of California's overtime pay provisions against employers of these maritime workers.

Aubry filed a timely notice of appeal.

## JURISDICTION AND SCOPE OF RELIEF

■ Because PMSA and Tidewaters' complaints sought to enjoin enforcement of California law based on federal preemption, this case "arose under" federal law, and the district court properly exercised jurisdiction over PMSA's action for injunctive relief. *See Southern Pac. Transp. Co. v. Public Utils. Comm'n of State of Cal.*, 716 F.2d 1285, 1288-89 (9th Cir.1983), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983).

Actions for declaratory and injunctive relief, however, must be carefully limited in scope to meet the "case and controversy" requirements of Article III of the Constitution. *O'Shea v. Littleton,* 414 U.S. 488, 493-95, 94 S.Ct. 669, 674-76, 38 L.Ed.2d 674 (1974); *Maryland Casualty Co. v. Pac. Coal and Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). Before the district court, PMSA, Tidewater, and Aubry argued at length over the precise scope of the declaratory and injunctive relief action. PMSA and Tidewater sought a ruling on all employees of its members with respect to a broad range of California labor code provisions. 709 F.Supp. at 1522-23. Aubry, on the other hand, sought to limit the scope of the action to only those employees to which he had applied California's overtime provision. *Id.*

Applying the constitutional rule that "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979), the district court limited the scope of relief to cover only application of California's overtime pay laws to (1) FLSA-exempt seamen, whether working within the territorial zone or on the high seas; and (2) maritime employees working

primarily on vessels on the high seas that are not engaged in foreign, intercoastal, or coastwise voyages. 709 F.Supp. at 1522–23, 1526.[5] The district court expressly stated that its decision did not affect the rights of non-FLSA exempt maritime employees working within California's territorial waters. 709 F.Supp. at 1523 n. 7.[6] We conclude that, within these limits, the scope of the declaratory relief met the Constitution's case and controversy requirements. *See Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. at 298–305, 99 S.Ct. at 2308–12.

## STANDARD OF REVIEW

We review a grant of summary judgment de novo. *Kruso v. International Tel. & Tel. Corp.,* 872 F.2d 1416, 1421 (9th Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990).

## DISCUSSION

This appeal turns on one core issue: Does federal law preempt California from applying its overtime pay laws to seamen working on territorial waters and on the high seas off the California coast and to maritime employees working primarily on the high seas off the California coast, when the vessels on which the employees work do not engage in foreign, intercoastal, or coastwise voyages? For the reasons stated below, we hold that it does not.

█ PMSA and Tidewater contend that California's overtime pay laws are preempted by two federal statutes—the Shipping Act and the FLSA—and by general admiralty law. To decide whether a federal statute preempts state law, "our sole task is to ascertain the intent of Congress." *California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). Federal law preempts state law if (1) Congress expressly so states, (2) Congress enacts comprehensive laws that leave no room for additional state regulation, or (3) state law actually conflicts with federal law. *Id.* at 280–81, 107 S.Ct. at 689–90; *see Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984); *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483, 486 (9th Cir.1984), *cert. denied,* 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985).

█ States, however, possess broad authority under their police powers to regulate the employment relationship to protect resident workers. *De Canas v. Bica,* 424

5. There is some ambiguity in the record and in the district court's opinion about whether the relief granted also covered maritime employees working primarily on vessels on the high seas that are engaged in *coastwise* voyages. The district court cited the deposition testimony of a California Division of Labor Standards Enforcement official that suggested that Aubry intended to apply California overtime wage laws to *non-inhabitant* maritime employees. The court apparently concluded that the commissioner might possibly apply California law to employees who voyage from California to other states, 709 F.Supp. at 1255, and that the threat of enforcement of California wage laws against employers engaged in coastwise voyages was sufficient to present a justiciable controversy under Article III of the Constitution as to those employers. On the other hand, the overall thrust of the district court's analysis strongly suggests that the discussion was limited to employees, like those who brought claims in the underlying state administrative action, who work only on vessels off the California coast that do not engage in foreign, intercoastal, or coastwise voyages. *See* 709 F.Supp. at 1519, 1523–25. This ambiguity may be due to the fact that the employees involved in this action work on coastwise *vessels, see* 46 C.F.R. § 70.10–13 (1988) (defining "coastwise vessels" as vessels "normally navigating the waters ... 20 nautical miles or less offshore"), but were *not* in fact engaged in coastwise *voyages, see* 709 F.Supp. at 1524. We resolve any arguable ambiguity over the scope of the relief granted by the district court by limiting the scope of our opinion to those employees described and discussed by the district court, i.e., maritime employees who work off the California coast on vessels that do not engage in foreign, intercoastal, or coastwise voyages. We do not address the question whether Aubry is preempted by federal law from applying California's overtime pay laws to maritime employees employed primarily on the high seas on *coastwise* vessels engaged in *coastwise* voyages.

6. PMSA agrees in its brief to this court that Aubry "is currently free to apply California's overtime laws to non-FLSA-exempt, general maritime law seamen [i.e., maritime employees] with respect to work that takes place primarily within California's territorial waters."

U.S. 351, 356, 96 S.Ct. 933, 936, 47 L.Ed.2d 43 (1976). Thus, in addressing the preemption question before us, " 'we start with the assumption that the historic powers of the States were not to be superseded by [federal legislation] unless that was the *clear and manifest* purpose of Congress.' " *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d at 488 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)) (emphasis added in *Hammond* ).

### I. The Shipping Act

■ PMSA and Tidewater assert that Congress preempted Aubry's actions in this case by extensively regulating maritime employment through the Shipping Act. The district court rejected this contention and held that Aubry's enforcement of California's overtime provisions to maritime employees on the high seas and seamen is not preempted by statutory maritime law. *See* 709 F.Supp. at 1523–24. According to the district court, "[m]aritime statutes simply do not purport to govern the overtime wages of employees such as those in this action." 709 F.Supp. at 1524. We agree with the district court's conclusion that the Shipping Act does not preempt California overtime pay laws with respect to the seamen and maritime employees at issue in this case.

■ The Shipping Act does govern some maritime employees' wages, hours, and working conditions. *See* 46 U.S.C. §§ 10301–10908: As the district court noted, however, these provisions *do not apply* to the employees involved in this appeal, because they cover only vessels engaged in foreign, intercoastal, or coastwise voyages. *Id.*[7] Further, while all maritime employees are covered by certain provisions relating to "protection and relief," e.g., accommodations on ship, 46 U.S.C. § 11101, medical care for maritime workers, 46 U.S.C.

§ 11102, and limitations on attachment of wages, 46 U.S.C. § 11109, these provisions in no way regulate overtime pay.

■ PMSA and Tidewater both argue, however, that to apply California's overtime pay laws to maritime employees and seamen conflicts with 46 U.S.C. § 8104, which sets "manning requirements"—including maximum hours and minimum "watches"—for maritime workers.[8] Under 46 U.S.C. § 8104(b),

> [o]n an oceangoing or coastwise vessel of not more than 100 gross tons (except a fishing, fish processing, or fish tender vessel), a licensed individual may not be required to work more than 9 of 24 hours when in port, including the date of arrival, or more than 12 of 24 hours at sea, except in an emergency when life or property are [sic] endangered.

Maritime employers who violate this section are subject to civil penalties. 46 U.S.C. § 8104(i), (j). PMSA and Tidewater contend that California's overtime pay laws, which require overtime pay for hours worked in excess of eight hours per day, conflict with this federal statutory provision by creating a maximum below the 12 hour maximum established in section 8104(b).

We reject this contention. We addressed a similar argument in *Agsalud v. Pony Express Courier Corp. of Am.,* 833 F.2d 809 (9th Cir.1987) (*"Agsalud"*). In that case, a motor carrier contended that the state of Hawaii's overtime pay law was preempted by the federal Motor Carrier Act, 49 U.S.C. §§ 3101–3104. Regulations issued under the Motor Carrier Act generally provided for a maximum work week of 60 hours, while the Hawaii statute required overtime pay for work in excess of 40 hours per week. *Id.* at 810. We held that, absent a showing that the state law had the effect of establishing a firm maximum on hours worked different from the maxi-

---

7. The district court found: "The crewmembers whose claims precipitated this action were not on 'voyages' that fall under any of these three categories. Their vessels either stayed on the high seas surrounding the oil rigs or 'voyaged' between one port and the oil rigs." 709 F.Supp. at 1519.

8. Section 8104 is not limited to vessels engaged in foreign, intercoastal, or coastwise voyages, and, therefore, applies to the employees at issue in this case. *See* 46 U.S.C. § 8101–8105.

mum set by federal law, Hawaii's overtime pay provisions did not conflict with federal law, and were not preempted. *Id.* We explained that "[o]ne need not be an economist to realize that some employers may continue to provide more than 40 hours of work even though an overtime premium is required, because paying the premium may be cheaper than the alternatives of not providing service to customers or hiring new help." *Id.*

Our reasoning in *Agsalud* applies with equal force here. PMSA and Tidewater have made no showing that the effect of Aubry's enforcement action will be to set a firm maximum different from that set in 46 U.S.C. § 8104. The argument that California's overtime pay law conflicts with section 8104 of the Shipping Act and is preempted, therefore, fails.

While the Shipping Act does comprehensively regulate maritime activities, it does not regulate overtime pay for the workers involved in this case. The Shipping Act does not preempt California from applying its overtime pay laws to the seamen and maritime employees involved in this action.

## II. The FLSA

After rejecting PMSA and Tidewaters' Shipping Act preemption argument, the district court held that the FLSA preempted California overtime pay laws with respect to the employees at issue in this case. The district court concluded that, with respect to FLSA-exempt seamen, Congress' decision to exclude seamen from the federal act's overtime provisions evinced its intent to preempt all state overtime laws as to those employees, whether on territorial waters or on the high seas. 709 F.Supp. at 1525. The district court further held that, with respect to general maritime employees, California overtime provisions conflict with the FLSA, and that the FLSA's savings clause[9] cannot save state laws regu-

lating workers on vessels "primarily situated on the high seas." 709 F.Supp. at 1524–25.

### A. *Exemption of Seamen from the FLSA*

■ We address first the question whether, by exempting seamen from federal overtime coverage under 29 U.S.C. 213(b)(6), Congress preempted California's overtime laws with respect to seamen. We hold that section 213(b)(6) does not preempt California from applying the state's overtime pay laws to FLSA-exempt seamen working off the California coast.

The Seamen involved in this case work both on California's territorial waters and on the high seas.[10] The district court held that the FLSA preempts California's overtime provisions as applied to seamen on the high seas *and* on territorial waters, reasoning that, because seamen are exempt from federal overtime provisions under the FLSA, 29 U.S.C. § 213(b)(6), "Congress has spoken directly on the issue of overtime pay for seamen." 709 F.Supp. at 1525. This holding raises an important issue regarding the effect of a specific exemption of a category of maritime workers—seamen—from coverage under federal law, i.e., should the specific legislative provision exempting seamen from the FLSA's overtime compensation standards be read broadly to indicate congressional intent to preclude states from regulating the subject of seamen's overtime compensation?

No Ninth Circuit case squarely addresses this issue. We turn, then, to an examination of the language and legislative history of the FLSA.

When Congress originally enacted the FLSA of 1938, it exempted seamen from coverage under the act's minimum wage and overtime provisions. In 1961, Congress brought seamen employed on Ameri-

---

9. Under 29 U.S.C. § 218(a), no provision of the FLSA preempts another federal, state, or municipal law from "establishing a minimum wage higher than the minimum wage established under [the FLSA] or a maximum workweek lower than the maximum workweek established under [the FLSA]."

10. As noted above, "seamen" as used by the district court is defined more narrowly than "maritime employee."

can vessels under the FLSA's minimum wage provisions, but maintained their exemption from coverage under the act's overtime provisions. At no time has Congress expressly prohibited states from applying their overtime laws to seamen. Further, PMSA and Tidewater point to nothing in the legislative history of § 213(b)(6)—either in the 1938 act or in the 1961 amendments to the FLSA—that suggests that Congress intended to preclude application of state overtime provisions to seamen. Our review of the legislative history has revealed no such congressional intent.[11]

The legislative history of the FLSA does show that Congress considered the special circumstances of maritime and other types of labor when it exempted seamen and other employees from the FLSA's overtime and minimum wage provisions. Federal Amicus argues, however, and we agree, that in exempting seamen from coverage under the 1938 act's overtime and minimum wage provisions, Congress intended to prevent overlapping regulation of wage and hour conditions of seamen by different federal agencies. *See Joint Hearings on S. 2475 and H.R. 7200 Before the Senate Comm. on Education and Labor and the House Comm. on Labor,* 75th Cong., 1st Sess. 546–49, 1216–17 (1937); 82 Cong.Rec. 1784–85, 7875 (1937); *see also* 29 C.F.R. § 783.29 (1989) (discussing legislative history of exemption).[12] Further, the extensive legislative history of the 1961 amendments to the FLSA makes clear Congress' determination that federal minimum wage levels for seamen were necessary, but discloses nothing indicating that, by leaving the exemption of seamen from the FLSA's overtime provisions in place, Congress intended to preclude states from applying overtime pay provisions to FLSA-exempt seamen.[13]

Related case authority supports the conclusion that, absent clear congressional intent to the contrary, the exemption of seamen from the FLSA's overtime provisions does not, per se, preempt California from applying its overtime pay laws to seamen. In *Agsalud,* For example, we held that the exemption of truck drivers engaged in interstate transportation of goods from the

**11.** *See Joint Hearings on S. 2475 and H.R. 7200 Before the Senate Comm. on Education and Labor and the House Comm. on Labor,* 75th Cong., 1st Sess. 544–549, 1216–17 (1937); 82 Cong.Rec. 1784 (1937); 82 Cong.Rec. 7875 (1937). *See also Hearings on Various Bills Regarding Minimum Wage Legislation Before the Subcomm. on Labor Standards of the House Comm. on Education and Labor,* 86th Cong., 2d Sess. 885–92, 895–96, 920–48, 1522–23 (1960); *Hearings on H.R. 3935 and Various Bills Regarding Minimum Wage Legislation Before the Special Subcomm. on Labor of the House Comm. on Education and Labor,* 87th Cong., 1st Sess. 63–64, 83, 379–80, 597–99 (1961); *Hearings on S. 256, S. 879, S. 895 and Bills Amending the Fair Labor Standards Act Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare,* 87th Cong., 1st Sess. 15, 41, 376–93, 558, 682–83 (1961); H.R.Rep. No. 75, 87th Cong., 1st Sess. 13–14, 31 (1961); S.Rep. No. 145, 87th Cong., 1st Sess. 103 (1961), U.S.Code Cong. & Admin.News 1961, 1620.

**12.** Under the FLSA of 1938 as proposed, all wage and hour claims were to be handled by a new Labor Standards Board. At the time Congress was considering the proposed legislation, however, maritime employees' wage and hour claims were handled by the Maritime Commission under the Merchant Marine Act of 1936. *See Joint Hearings on S. 2475 and H.R. 7200 Before the Senate Comm. on Education and Labor and the House Comm. on Labor,* 75th Cong., 1st Sess. 1216–17. At least one witness testifying on behalf of organized labor supported the exemption of seamen from the FLSA's overtime and minimum wage provisions on the ground that overlapping federal agency jurisdiction over seamen's wage and hour claims could threaten gains already achieved by organized maritime labor before the Maritime Commission. *See id.* at 544–49 (testimony of Ralph Emerson, Legislative Representative, National Maritime Union of America).

**13.** *See Hearings on Various Bills Regarding Minimum Wage Legislation Before the Subcomm. on Labor Standards of the House Comm. of Education and Labor,* 86th Cong., 2d Sess. 885–92, 895–96, 920–48, 1522–23 (1960); *Hearings on H.R. 3935 and Various Bills Regarding Minimum Wage Legislation Before the Special Subcomm. on Labor of the House Comm. on Education and Labor,* 87th Cong., 1st Sess. 63–64, 83, 379–80, 597–99 (1961); *Hearings on S. 256, S. 879, S. 895 and Bills Amending the Fair Labor Standards Act Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare,* 87th Cong., 1st Sess. 15, 41, 376–93, 558, 682–83 (1961); H.R.Rep. No. 75, 87th Cong., 1st Sess. 13–14, 31 (1961); S.Rep. No. 145, 87th Cong., 1st Sess. 103 (1961), U.S.Code Cong. & Admin.News 1961, 1620.

FLSA's overtime provisions did not preempt state overtime laws as to those workers. 833 F.2d at 810. In reaching that conclusion, we expressly adopted the reasoning of *Pettis Moving Co., Inc. v. Roberts*, 784 F.2d 439 (2d Cir.1986) (*"Pettis Moving Co."*), and *Williams v. W.M.A. Transit Co.*, 472 F.2d 1258 (D.C.Cir.1972) (*"Williams"*), two cases involving the question whether exemption of certain employees from the FLSA's wage provisions, per se, preempts state law with respect to those employees. *See Agsalud*, 833 F.2d at 810.

In *Pettis Moving Co.*, a New York motor carrier argued that, because Congress exempted employees of interstate motor carriers from coverage under the FLSA's overtime provisions, New York could not apply its overtime pay laws to those employees. The Second Circuit first emphasized that "[t]raditional powers of the states ... are not superseded by federal acts unless that was the clear and manifest purpose of Congress." 784 F.2d at 441 (*citing Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978)). The court then noted that the FLSA's savings clause "explicitly permits states to set more stringent overtime provisions than the FLSA," and held that "Congress did not prevent the states from regulating overtime wages paid to workers exempt from the FLSA." *Id.* at 441.

In *Williams*, the D.C. Circuit addressed the question whether the District of Columbia's minimum wage laws could be applied to bus drivers who were employed by interstate motor carriers and, therefore, were exempted from the FLSA's minimum wage provisions. That court also relied on the FLSA's savings clause in finding no preemption: "This section expressly contemplates that workers covered by state law as well as FLSA shall have any additional benefits provided by the state law—higher minimum wages; or lower maximum workweek. By necessary implication it permits

state laws to operate even as to workers exempt from FLSA." 472 F.2d at 1261.

Finally, at least one district court in our circuit has held that Congress' exemption of certain maritime employees from coverage under a maritime wage statute did not preempt a state from regulating those employees' wages. In *Sewell v. M/V Point Barrow*, 556 F.Supp. 168 (D.Alaska 1983) (Fitzgerald, D.J.), workers employed on vessels engaged in offshore test drilling off the Alaska coast filed an action to recover unpaid wages and for penalties under state and federal law. After holding the employees were exempted from coverage under the federal statute,[14] the court reached the employer's contention that "the exemption of coastwise vessels from the [federal] penalty provisions ... demonstrate[d] a congressional intent that seamen employed on coastwise vessels not receive delayed wage payment penalties." *Id.* at 169. The court rejected this argument based on its conclusion that Congress did not intend, by exempting coastwise seamen, to preempt state wage penalty laws, but rather intended that coastwise seamen would be treated like other workers under state law. *Id.* at 170.

Based on these authorities and on general principles of federal preemption, we hold that, in light of the plain language of the FLSA's savings clause and in the absence of a clear indication from Congress to the contrary, § 213(b)(6) does not preclude enforcement of California's overtime provisions to protect the California-resident seamen in this case. The district court erred by holding that section 213(b)(6) preempts California overtime pay laws with respect to FLSA-exempt seamen on the high seas and within the territorial zone off the California coast.

### B. *Non–FLSA–Exempt Maritime Employees on the High Seas*

█ We next address the question whether the FLSA preempts California

---

**14.** The employees sought penalties for failure to pay wages under 46 U.S.C. § 596, which provides that an employer who fails to pay wages shall pay a penalty equal to two days' wages for each unpaid day. Under 46 U.S.C. § 544, however, employees on "coastwise" voyages are ex-

empted from 46 U.S.C. § 596. The district court in *Sewell v. M/V Point Barrow* held that the employees who brought the action were employed on vessels engaged in coastwise trade and were exempt from coverage under 46 U.S.C. § 596.

from applying the state's overtime pay laws to maritime workers, not exempt from the FLSA, who work on vessels situated primarily on the high seas off the California coast.

The parties agree that California's overtime pay laws and the FLSA overtime provisions that cover non-exempt maritime employees conflict, and that California's provisions are more generous than the FLSA.[15] The key issue is whether the FLSA's savings clause allows California to apply its more generous overtime laws to the maritime workers involved in this case. The savings clause provides in relevant part:

No provision of this chapter or of any order thereunder shall excuse noncompliance with any federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum workweek lower than the maximum workweek established under this chapter....

29 U.S.C. § 218(a).

Aubry and federal amicus contend that the savings clause signals Congress' intent that the wage and hour standards set in the FLSA are a floor, and that states are free to establish wage and hour levels higher or more generous than the FLSA standards. They further argue that Congress, in enacting the FLSA, evinced no intent to preclude maritime workers' benefiting from the savings clause. The district court rejected this argument, based on its conclusion that principles of federal admiralty law require that the FLSA's savings clause

be construed restrictively in this case. The district court reasoned:

[T]he FLSA's savings clause cannot properly be construed to save state laws that seek to regulate the employment of maritime employees whose work situs is a vessel normally situated on the high seas. This is so because Congress may not constitutionally delegate its maritime jurisdiction to the states. Such a delegation would destroy the harmony and uniformity of admiralty law established by the Constitution. Thus, under compulsion of the Constitution, the savings clause must be interpreted as not applying to maritime employees employed primarily on the high seas.

709 F.Supp. at 1524–25 (citations omitted). According to the district court, while this restrictive interpretation of the savings clause "lacks direct precedential support," common sense demanded it. *Id.* at 1525.

 For the reasons stated below, we hold that the district court erred. Neither the FLSA, by its terms, nor general admiralty law preempts California from applying the state's overtime pay laws to non-exempt maritime workers at issue in this case.

1. *Jensen* and its Progeny

 The district court based its restrictive reading of section 218 on a long line of cases, beginning early in this century, in which courts limited states' power to regulate maritime activities on the ground that the United States Constitution requires uniformity in admiralty law. Article III, Section 2 of the Constitution provides in part

---

15. According to the district court, "the California overtime provisions and the FLSA provisions produce widely differing results." 709 F.Supp. at 1524. The most important differences between California's overtime pay provisions and the FLSA are as follows: under California law, overtime at one and one-half times an employee's regular rate must be paid after eight hours work per day, 8 Cal.Code Regs. § 11040.3(A)(1), while under the FLSA, overtime must be paid after 40 hours work per week, 29 U.S.C. § 207(a); 29 C.F.R. § 778.101; under California law, all hours in excess of 12 per day must be paid at double time, 8 Cal.Code Regs. § 11040.3(A)(2), while the FLSA contains no such provision; under California law, "hours

worked" is defined broadly, to include "the time during which an employee is subject to the control of an employer," 8 Cal.Code Regs. § 11040.2(H), while under the FLSA "hours worked" as applied to seamen includes only hours when the employee is "actually on duty," 29 U.S.C. § 206(a)(4); and under California law, payments to employees on a "fluctuating workweek" basis—i.e., by fixed salary that reflects average hours worked—are not permitted, *Skyline Homes, Inc. v. Dept. of Indus. Relations,* 165 Cal.App.3d 239, 211 Cal.Rptr. 792 (1985), while under the FLSA, such payments are allowed in certain limited circumstances, 29 C.F.R. § 778.114.

that the judicial power of the United States shall extend "to all cases of admiralty and maritime jurisdiction." The Supreme Court has held that this provision, by implication, grants Congress the power to revise and supplement the maritime law, and grants federal courts power to develop the general maritime law. *See Romero v. International Terminal Operating Co.,* 358 U.S. 354, 360–61, 79 S.Ct. 468, 473–74, 3 L.Ed.2d 368 (1959).

In *Southern Pac. Co. v. Jensen,* 244 U.S. 205, 216, 37 S.Ct. 524, 529, 61 L.Ed. 1086 (1917) (*"Jensen"*), the Supreme Court restricted states' authority in maritime matters based on this constitutional grant of authority to the federal government. Under the so-called *Jensen* doctrine, no state legislation concerning navigation is valid

> if it contravenes the essential purpose expressed by an act of Congress or works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations.

This

> limitation, at the least, is essential to the effective operation of the fundamental purposes for which [the maritime] law was incorporated into our national laws by the Constitution itself.

*Jensen,* 244 U.S. at 216, 37 S.Ct. at 529. This rule was extended in *Knickerbocker Ice Co. v. Stewart,* 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920) (*"Knickerbocker Ice"*), where the Supreme Court struck down an act of Congress that directly granted states authority to apply state workers compensation laws to maritime employers. The Court stated that the delegation was "beyond the power of Congress." *Id.* at 164, 40 S.Ct. at 441.

Here, the district court reasoned that the constitutional considerations underlying *Jensen* and *Knickerbocker Ice* foreclosed straightforward application of the FLSA's savings clause *to a specific category of workers—maritime employees employed*

*primarily on the high seas.* According to the district court, allowing the FLSA's savings clause to permit California's actions in this case would effect a *delegation* of maritime authority, invalid under *Knickerbocker Ice,* and would otherwise be invalid as destructive of harmony in federal admiralty law.

We disagree with the district court's holding that section 218, if construed to allow Aubry's actions with respect to maritime employees on the high seas, would in effect be a *delegation* of congressional maritime powers to the state. California's actions in this case represent an exercise of traditional police powers firmly in place *before* Congress enacted the FLSA. *See West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 393, 57 S.Ct. 578, 582, 81 L.Ed. 703 (1937) ("In dealing with the relation of employer and employed, the [state] has necessarily a wide field of discretion in order that there may be suitable protection of health and safety, and that peace and good order may be promoted through regulations designed to insure wholesome conditions of work and freedom from oppression."). Thus Congress did not "delegate" authority to the states through section 218, but simply made clear its intent not to disturb the traditional exercise of the states' police powers with respect to wages and hours more generous than the federal standards. We cannot read section 218 as a delegation, and, therefore, conclude that *Knickerbocker Ice* does not control this case.

This conclusion, however, does not settle the issue before us. General principles of admiralty law still limit states' authority to regulate maritime activities. We must determine whether, under *Jensen* and its progeny, those principles require a restrictive reading of section 218 in this case.

"The *Jensen* doctrine, though easily stated, is not easily applied." 1 Friedell, *Benedict on Admiralty,* § 112, at 7–36 (7th ed. 1987).[16] The Supreme Court long ago re-

---

16. *See generally* 1 Friedell, *Benedict on Admiralty,* §§ 11–114, at 7–31 to 7–72 (reviewing doctrine limiting power of states to independently regulate maritime matters); Gilmore and Black, *The Law of Admiralty* 49–50 (same); D. Robertson, *Admiralty and Federalism* 200 (1970)

jected a rigid per se rule that all state regulation of maritime activities is constitutionally invalid. In *Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 338, 93 S.Ct. 1590, 1598, 36 L.Ed.2d 280 (1973), for example, a unanimous court explained that *Jensen* and *Knickerbocker* have been "limited by subsequent holdings of [the] Court." In *Romero v. Int'l Terminal Operating Co.,* 358 U.S. at 373, 79 S.Ct. at 480, the Court explained that *Jensen*'s limitation on state authority "still leaves the States a wide scope." *See also Just v. Chambers,* 312 U.S. 383, 388, 61 S.Ct. 687, 85 L.Ed. 903 (1941) (state may modify or supplement maritime law); *Maryland Casualty Co. v. Cushing,* 347 U.S. 409, 429, 74 S.Ct. 608, 618, 98 L.Ed. 806 (Black, J., dissenting) (except in limited circumstances, "states are free to make laws relating to maritime affairs").

Yet the Court has demonstrated the continuing force of *Jensen.* In *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (*"Tallentire"*), the Court held that the federal admiralty law—specifically, the Death on the High Seas Act (DOSHA), 46 U.S.C. §§ 761–768—preempted Louisiana's wrongful death statute, notwithstanding a DOSHA savings clause that provided that "[t]he provisions of any State statute giving or regulating rights of action or remedies for death shall not be affected" by the DO-SHA. The court cited *Jensen* for the proposition that " '[n]o [state] legislation is valid if it contravenes the essential purpose expressed by an act of Congress.' " *Id.* at

228, 106 S.Ct. at 2497 (quoting *Jensen,* 244 U.S. at 216, 37 S.Ct. at 529); *see also Askew v. American Waterways Operators, Inc.,* 411 U.S. at 344, 93 S.Ct. at 1601 (acknowledging that *Jensen* "has vitality left").

██ Our review of relevant case authority leads us to conclude that the general rule on preemption in admiralty is that states may supplement federal admiralty law as applied to matters of local concern, so long as state law does not *actually conflict* with federal law or *interfere* with the *uniform working* of the maritime legal system.[17] The questions, then, are (1) whether applying California's overtime provisions to maritime employees on the high seas contravenes an act of Congress, and (2) whether applying the provisions would unduly disrupt uniformity in maritime law.

### 2. Does California's Overtime Pay Law Contravene an Act of Congress?

The district court found, and we agree, that the maritime employees "fall in the interstices between express federal maritime statutes." 709 F.Supp. at 1525. Maritime statutes do not apply to maritime employees, like these, who are not on vessels making foreign, intercoastal, or coastwise voyages. In addition, Congress has specifically allowed states to enforce overtime laws more generous than the FLSA, 29 U.S.C. § 218(a), and we find no indication that Congress intended that maritime employees not benefit from more generous state wage and hour laws. California's

(same); Currie, *Federalism and the Admiralty: "The Devil's Own Mess,"* S.Ct.Rev. 158 (1960) (same).

**17.** *See* 1 Friedell, *Benedict on Admiralty* § 112, at 7–36; Gilmore and Black, *The Law of Admiralty* 50 (2d ed. 1975); Tribe, *American Constitutional Law* 304 (2d ed. 1988). There is ample support for this rule in our circuit. *See Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483, 496 (9th Cir.1984), *cert. denied,* 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985) (state law should be preempted only to the extent necessary to protect the achievement of the aims of the federal act in question); *Wasyl, Inc. v. First Boston Corp., Inc.,* 813 F.2d 1579, 1582 (9th Cir.1987) (same); *Bergen v. F/V St. Patrick,* 816 F.2d 1345, 1348–49 (9th Cir.1987) (" 'there is a basic differ-

ence between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted' ") (quoting *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 624–25, 98 S.Ct. 2010, 2014–15, 56 L.Ed.2d 581 (1978)); *Sewell v. M/V Point Barrow,* 556 F.Supp. 168, 169 (D.Alaska 1983) ("admiralty courts may recognize and enforce rights and obligations created by state law"). Other circuits' cases also support the rule. *See Carey v. Bahama Cruise Lines,* 864 F.2d 201, 207 (1st Cir.1988); *Exxon Corp. v. Chick Kam Choo,* 817 F.2d 307, 317–18 (5th Cir.1987), *rev'd on other grounds,* 486 U.S. 140, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988); *Steelmet, Inc. v. Caribe Towing Corp.,* 779 F.2d 1485, 1488 (11th Cir. 1986).

attempt to supplement federal law in this case does not present an irreconcilable conflict with the statutory maritime law or with the FLSA; it does not "contravene the essential purpose expressed by an act of Congress." *Cf. Tallentire*, 477 U.S. at 228, 106 S.Ct. at 2497; *Jensen*, 244 U.S. at 216, 37 S.Ct. at 529.

This case, therefore, differs significantly from two recent Supreme Court decisions the district court relied on in narrowly construing section 218 of the FLSA: *Oil, Chem., & Atomic Workers, Int'l Union, AFL–CIO v. Mobil Oil Corp.*, 426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976) (*"Mobil Oil"*), and *Tallentire*. *Mobil Oil Corp.* and *Tallentire* both involved interpretation of savings clauses in federal statutes, and the Court construed the savings clauses narrowly in each case. *Mobil Oil* and *Tallentire*, however, do not require a restrictive interpretation of section 218 of the FLSA in this case.

The issue in *Mobil Oil* was whether Texas could apply its "right-to-work" laws to workers employed on oil tankers on the high seas off the Texas coast. Like the present case, *Mobil Oil* required interpretation of a savings clause—federal labor statutes expressly allow so-called union "agency shop" agreements,[18] 29 U.S.C. § 158(a)(3), but also allow states to prohibit such agreements through "right-to-work" laws, 29 U.S.C. § 164(b). The Court, as a matter of statutory interpretation, held that the savings clause at issue could not be read to allow Texas to apply its right-to-work laws to maritime employees who worked on the high seas outside of the state's territorial waters. In so holding, however, the Court relied on clear legislative history expressing congressional intent to restrict the savings clause's reach. Congress, the Court concluded, "viewed [the

savings clause] as allowing a State to ban [agency shop] agreements calling for work to be performed *within the State.*" 426 U.S. at 418, 96 S.Ct. at 2145 (emphasis added). Further, the Court noted that the purpose and effect of Texas right-to-work law directly conflicted with the federal statute. *Id.* at 417, 96 S.Ct. at 2145.

In *Tallentire*, the Court held that a DOHSA savings clause that allowed wrongful death actions in state courts for deaths on the high seas did not allow states to apply their *substantive* state wrongful death laws to deaths on the high seas, but instead only preserved state court *jurisdiction* to hear wrongful death actions under the DOHSA. 477 U.S. at 220–32, 106 S.Ct. at 2493–99. As in *Mobil Corp.*, the Court based its restrictive interpretation of the savings clause at issue on the language, purpose, and legislative history of the federal statute.[19] And again, the Court noted the clear conflict between the state law and federal statute: "No reasonable doubt could be entertained of the displacement of state remedies for deaths occurring on the high seas because the conflicting federal standard was not derived just from general federal maritime law; it was explicitly provided for by federal legislation directly on point." *Id.* 477 U.S. at 228, 106 S.Ct. at 2497. Further, the Court noted that an express purpose of Congress in enacting the DOSHA was to achieve uniformity in wrongful death actions for deaths on the high seas. *Id.* at 230–31, 106 S.Ct. at 2498–99.

In contrast to the savings clauses at issue in *Mobil Oil* and *Tallentire*, we find no indication in the language or legislative history of the FLSA's savings clause that Congress intended that section 218 not allow states to apply more generous overtime pay laws to maritime workers work-

---

18. "An 'agency shop' agreement generally provides that while employees do not have to join the union, they are required ... to pay the union a sum equal to the union initiation fee and are obligated as well to make periodic payments to the union equal to the union dues." *Mobil Oil*, 426 U.S. at 409 n. 1, 96 S.Ct. at 2141 n. 1.

19. That history revealed strong expressions by bill supporters that federal law would apply exclusively to actions for deaths on the high seas. *See Tallentire*, 477 U.S. at 223–30, 106 S.Ct. at 2494–98. *See also* Gray, *Applicability of State Wrongful Death Statutes on the High Seas*, 18 J.Mar.L. & Com. 67, 81–88 (1987) (discussing *Tallentire* and legislative history of DOSHSA savings clause).

ing on the high seas. In addition, California's more protective overtime provisions are compatible with, rather than conflict with, the federal statute. Compatible state law may supplement federal admiralty law. *See Chevron U.S.A., Inc. v. Hammond*, 726 F.2d at 495–501 (finding no conflict between federal maritime statute and more stringent state maritime law provisions); *Sewell v. M/V Point Barrow*, 556 F.Supp. at 170–71 (same). Neither *Mobil Oil* nor *Tallentire* requires preemption in this case.[20]

3. Does California's Overtime Pay Law Unduly Disrupt Uniformity in Admiralty Law?

The district court based its holding in part on the "common sense" notion that "the uniformity of federal admiralty law would be destroyed if the states were permitted to 'add on' to the federal law enacted by Congress." 709 F.Supp. at 1525. Likewise, PMSA and Tidewater argue on appeal that allowing states to enforce their overtime provisions against maritime employers would produce a "crazy-quilt pattern of regulation."

The Constitution tolerates some disharmony in admiralty law. As discussed above, states may supplement admiralty law, and states' supplementation of admiralty law necessarily creates some discord in that law.[21] Nevertheless, *Mobil Oil*, *Tallentire*, and *Jensen* and its progeny make clear that the interest in uniformity in admiralty law must be considered in determining the validity of state regulation of maritime activities. Our circuit has also acknowledged the importance of uniformity

in admiralty law. *See, e.g., Evich v. Morris*, 819 F.2d 256, 257–58 (9th Cir.), *cert. denied*, 484 U.S. 914, 108 S.Ct. 261, 98 L.Ed.2d 218 (1987); *Nelson v. United States*, 639 F.2d 469, 473 (9th Cir.1980). We are left, therefore, with the difficult question whether applying California's overtime provisions to maritime employees who work on vessels on the high seas that do not engage in foreign, intercoastal, or coastwise voyages *unduly disrupts* harmony in the federal admiralty system, so as to render unconstitutional Aubry's actions. We hold that it does not.

Whether Aubry's application of California's overtime provisions unduly disrupts federal maritime harmony in violation of the Constitution depends on the balance of federal and state interests involved in application of the overtime provisions. *See Kossick v. United Fruit Co.*, 365 U.S. 731, 741–42, 81 S.Ct. 886, 893–94, 6 L.Ed.2d 56 (1961); *East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 864 n. 2, 106 S.Ct. 2295, 2299 n. 2, 90 L.Ed.2d 865 (1986); *Exxon Corp. v. Chick Kam Choo*, 817 F.2d 307, 317 (5th Cir.1987), *rev'd on other grounds*, 486 U.S. 140, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988); *Steelmet, Inc. v. Caribe Towing Corp.*, 779 F.2d 1485, 1488 (11th Cir.1986).

We conclude that the balance tips in favor of California in this case. Under California law, the Labor Commission is charged with enforcing state wage provisions to ensure the health, safety, and welfare of resident employees. Cal.Labor Code § 1173. Here Aubry has attempted to provide additional protection to employ-

---

**20.** Cases in our circuit relied on by PMSA and Tidewater are also distinguishable on the ground that the state laws invalidated as preempted by federal law in those cases were in direct conflict with federal admiralty law. *See Evich v. Morris*, 819 F.2d 256, 257–58 (9th Cir.), *cert. denied*, 484 U.S. 914, 108 S.Ct. 261, 98 L.Ed.2d 218 (1987) (state survival action preempted by conflicting federal maritime survival law); *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1348–49 (9th Cir.1987) (state punitive damages remedy in wrongful death action preempted by DOHSA, which disallows punitive damages remedy); *Nelson v. United States*, 639 F.2d 469, 473 (9th Cir.1980) (state wrongful death action preempted by conflicting federal

maritime wrongful death law); *Daughtry v. Diamond M Co.*, 693 F.Supp. 856, 861–63 (C.D.Cal. 1988) (state procedural rules on effect of settlement on joint tortfeasors' duty to contribute preempted by conflicting federal procedural rules).

**21.** "All state laws, if given effect in admiralty cases, interfere to a degree with the uniformity of admiralty law." Friedell, 1 *Benedict on Admiralty* § 12, at 7–36; *see also Romero v. International Terminal Operating Co.*, 358 U.S. at 374, 79 S.Ct. at 481 ("Maritime law is not a monistic system.").

ees involved in work of critical importance to the state—containment and clean-up of marine oil spills. In addition, the record indicates that the maritime employees involved in this case are California residents, were interviewed and hired in California, and pay California taxes. Their contacts with the state are quite close: the vessels involved in this case do not make coastwise, intercoastal, or foreign voyages; *Mr. Clean II* is moored in a California harbor 90 percent of the time and works exclusively on oil rigs off the California coast; and *Mr. Clean III* is stationed exclusively off the California coast and visits only California ports.

PMSA and Tidewater contend, however, that California's interest in enforcing its overtime pay laws in this case are undercut by Aubry's failure to comply with state administrative and procedural requirements regarding wage and hour rulemaking and law enforcement. This argument is misplaced. We emphasize that we are *not* deciding here whether Aubry's actions are valid *as a matter of California administrative and labor law.* Our task is to determine only whether, in this case, federal law preempts California's overtime pay provisions. The state's interests in applying its overtime provisions here are plain. PMSA and Tidewaters' challenges to Aubry's action on state law grounds must be directed to the state's agencies and courts, and we assume here that the

labor commissioner's actions comply fully with state law and procedures.[22]

In contrast to the California's strong interests, Federal interests in precluding enforcement of California's overtime provisions in this case are relatively weak. There is no indication that Congress, in enacting the FLSA's savings clause, intended to preempt states from according more generous protection to maritime employees on the high seas off a state's coastal waters. Further, the purpose behind the FLSA is to establish a national *floor* under which wage protections cannot drop, not to establish absolute uniformity in minimum wage and overtime standards nationwide at levels established in the FLSA.

■ Most important, because the maritime employees involved in this action are California residents who work on vessels that operate exclusively off the California coast, application of the state's overtime law will not disrupt international or interstate commerce. Uniformity in maritime law is required "only where the essential features of an exclusive federal jurisdiction are involved." 1 Friedell, *Benedict on Admiralty* § 111, at 7–32; *see Just v. Chambers*, 312 U.S. at 388, 61 S.Ct. at 691. The minimal impact that Aubry's actions would have on international and interstate maritime commerce leads us to conclude that the "essential features" of exclusive federal jurisdiction are not unduly burdened in this case.[23]

**22.** In some circumstances, comity requires that federal courts abstain from considering actions for declaratory and injunctive relief against state proceedings. *See Fresh Int'l Corp. v. Agricultural Labor Relations Bd.*, 805 F.2d 1353 (9th Cir.1986); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). According to the parties, however, no state court is currently considering the issues raised in this appeal. " '[T]he salient fact' in determining whether *Younger* abstention is appropriate 'is whether federal-court interference would unduly interfere with the legitimate activities of the state.' " *Sable Communications of Cal. v. Pacific Tel. & Tel.*, 890 F.2d 184, 190 (9th Cir.1989) (quoting *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 433 n. 12, 102 S.Ct. 2515, 2522 n. 12, 73 L.Ed.2d 116 (1982)). Here, we address only the purely federal question of whether federal statutes and general admiralty law preempt California's overtime pay laws.

We do not address any state law issues raised by Aubry's actions. Because there is no ongoing state adjudication of the claims here at issue, and because the state law challenges to Aubry's actions necessarily involve issues distinct from those federal issues now before us, concerns of comity underlying the *Younger* abstention doctrine are not present here. *See Id.; Fresh Int'l Corp. v. Agricultural Labor Relations Bd.*, 805 F.2d at 1358. The district court was not required to abstain.

**23.** This further distinguishes the present case from *Mobil Oil,* in which the Court noted the practical difficulties of allowing application of the state law in that case. *See* 426 U.S. at 418–19, 96 S.Ct. at 2145–46. In *Mobil Oil,* of the workers to which Texas sought to apply its laws, over half were residents of other states; over one-third listed New York, rather than Texas, as their port; and all were on vessels that voyaged

 We have focused in this section on the question whether, under general admiralty principles, California is preempted from applying the state's overtime pay laws to non-exempt maritime employees who work on vessels situated primarily on the high seas that do not engage in foreign, intercoastal, or coastwise voyages. But our analysis applies as well to FLSA-exempt seamen who work on such vessels. As we held above, allowing California to apply its overtime pay laws to seamen does not conflict with the FLSA; exemption from the FLSA's overtime provisions does not, per se, preempt state overtime laws. Also, the balance between state and federal interests is the same with respect to the seamen at issue in this case as it is with respect to nonexempt maritime workers. The Tidewater employee involved in the underlying action is a California resident; he works, like other California-based Tidewater employees, exclusively in California ports and on the high seas off the California coast. Thus, as with the maritime workers, we hold that allowing Aubry to apply California's overtime pay laws to the seamen involved in this suit does not unduly disrupt federal admiralty law, and, for that reason, is not constitutionally invalid.

Our conclusion that Aubry may constitutionally apply California's overtime provisions to maritime employees and seamen who work on the high seas off the California coast on vessels that do not engage in foreign, intercoastal, or coastwise voyages is supported by two recent decisions in this circuit. In *Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, we upheld an Alaska statute governing the discharge of ballast by oil tankers in Alaska's territorial waters where federal maritime law—the Port and Tanker Safety Act of 1978, 46 U.S.C. § 391—also regulated coastal ballast discharge. We recognized in *Hammond* Alaska's strong interest in preventing oil

pollution off its coast, noting that "[t]he subject matter of environmental regulation ... has long been regarded by the [Supreme] Court as particularly suited to local regulation." *Id.* at 488. We concluded that state and federal regulation of the oil tankers were compatible, and that "there is no ... dominant national interest in uniformity in the area of coastal environmental regulation." *Id.* at 492.[24] California has an equally strong interest in protecting maritime employees that reside in the state and work to protect California's coastal environment. *Hammond* thus lends support to Aubry's actions on the facts of the present case.

Also, in *Sewell v. M/V Point Barrow*, 556 F.Supp. 168, the Alaska District Court applied the state's wage laws to certain maritime employees working off the Alaska coast. The statute involved provided penalties, in the form of extra wage payments, to state workers not timely paid by maritime employers. *Id.* at 169–70. The district court held that, even though federal law did not provide such penalties for the employees in the case, enforcement of the Alaska statute was "fully compatible with federal maritime law," and no "feature of federal maritime law ... would be impaired or frustrated by application of [the statute]." *Id.* at 170. *Sewell* thus supports the conclusion that California may constitutionally apply its more generous overtime laws to protect California-resident workers employed on the high seas off California's coast under the circumstances of this case.

The district court erred by holding that, under principles of federal admiralty law, the FLSA's savings clause cannot allow Aubry to apply California overtime laws that afford greater protection than the FLSA to California-resident maritime employees working primarily on the high seas

---

regularly from Texas to New York or Rhode Island and back. 426 U.S. at 411, 96 S.Ct. at 2142. The practical problems present in *Mobil* are not present in this case.

**24.** We did note in *Hammond* that the interest in uniformity in environmental regulation is greater where regulations cover activities on the high

seas. 726 F.2d at 492 n. 2. Our concern there, however, was clearly with regulation of *international* oil transport and *international* environmental protection efforts. *Id.* Here, as discussed above, the federal interest in uniformity is not as great, because the employees involved in this case are not engaged in foreign, intercoastal, or coastwise voyages.

off the California coast on vessels that do not engage in foreign, intercoastal, or coastwise voyages, whether or not the employees are exempted from the FLSA's overtime provisions.

## CONCLUSION

Neither the Shipping Act nor the FLSA precludes Aubry's actions in this case, and, under the principles underlying *Jensen* and its progeny, applying California's overtime pay laws to these workers is not constitutionally invalid. Here, California's interest in protecting California-resident workers is great, the employees involved in the action work exclusively in waters off the California coast on vessels not engaged in foreign, intercoastal, or coastwise voyages, and Congress has shown no intent to preclude more generous state regulation of maritime workers. Aubry is not preempted from applying California's overtime provisions to the seamen and maritime employees involved in this suit.

The district court's judgment is REVERSED.

COPPLE, Senior District Judge, dissenting:

Judge Pregerson's majority decision explains in extensive detail the factual and procedural background of this appeal. Those facts will therefore only be highlighted. Twelve maritime employees filed complaints with the California Labor Commission seeking recovery of unpaid overtime wages due under the provisions of the California Industrial Welfare Commission Orders (8 Cal.Code of Regulations § 11345, *et seq.*). These maritime employees were hired by CLEAN SEAS, a company that owns and operates vessels which provide open ocean oil spill containment and recovery. The vessels are usually stationed over oil fields located in the Santa Barbara Channel approximately four to ten nautical miles off the California coast.

Some of the maritime employees are organized into crews that alternate work assignments in which they work seven days on the vessel followed by seven days rest on shore. At the beginning and end of the

seven day work assignments, the employees are transported via helicopter or vessel to and from the California coast.

In addition to those twelve employees, a deck engineer employed by TIDEWATER also filed a claim with the California Labor Commissioner for overtime against his employer. For that reason, TIDEWATER filed a complaint in intervention and was an intervenor on appeal. TIDEWATER provides offshore transportation in the Santa Barbara Channel between its pier or mooring buoy and oil rigs located between one and twelve miles offshore.

The Labor Commissioner of the State of California held a hearing pursuant to Cal. Lab.Code § 98 et seq. and made an award to each employee for unpaid overtime wages. In response to these awards, the employers along with various maritime associations filed a complaint for declaratory and injunctive relief in the District Court.

The District Court found that all of the employees in this action were engaged in activities on vessels which either stayed on the high seas surrounding the oil rigs or travelled between one port and the oil rigs located on the high seas. The District Court concluded that California could not apply its wage and hour provisions upon these employees who were primarily employed on the high seas because the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, preempted the application of such state laws to employees on the high seas. In so concluding, the District Court granted the employers' request for declaratory and injunctive brief, but limited the scope of the relief to, "(i) the FLSA-exempt seamen, whether working within the territorial zone or on the high seas, and (ii) maritime employees working primarily on vessels on the high seas that are not engaged in foreign or intercoastal voyages." *Pacific Merchant Shipping Ass'n v. Aubry*, 709 F.Supp. 1516, 1526 (C.D.Cal.1989). The District Court rejected a general federal admiralty law preemption argument, but held that the FLSA preempted California overtime pay laws with respect to the employees in this case.

A Court of Appeals may affirm a district court decision either on the same grounds, or on different grounds as those relied upon by the district court. *J.M. Martinac Shipbuilding v. Director, Office of Workers Compensation Programs*, 900 F.2d 180 (9th Cir.1990). Therefore, it is appropriate to examine whether the District Court's decision is correct under either general federal admiralty law or under the FLSA.

*I. Preemption Under Federal Admiralty Law*

All sides agree that state laws which conflict with federal admiralty laws cannot be enforced by the state. *See, Southern Pacific Co. v. Jensen*, 244 U.S. 205, 217, 37 S.Ct. 524, 529, 61 L.Ed. 1086 (1917); *Daughtry v. Diamond M. Co.*, 693 F.Supp. 856, 861 (C.D.Cal.1988). States may not apply their respective laws if the laws would "interfere with the proper harmony and uniformity" of existing admiralty law. *Southern Pacific Co.*, 244 U.S. at 216, 37 S.Ct. at 529; *see also, Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920) (striking down an act of Congress which granted authority to the states to apply their workers compensation laws to maritime employees). However, state laws which do not conflict with federal admiralty law and which do not conflict with the essential characteristics of maritime uniformity may be incorporated into federal admiralty law and applied. 14 Wright & Miller, Federal Practice & Procedure: Jurisdiction 2d Section 3671, pp. 421–422; *Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 341–42, 93 S.Ct. 1590, 1600, 36 L.Ed.2d 280 (1973).

With respect to the present case, the district court reasoned that while a number of federal provisions do cover the overtime wages of seamen on a variety of voyages, no federal maritime law expressly addressed the overtime pay of the seamen and other maritime workers such as those involved in this case. The court then concluded that because the Maritime statutes did not purport to govern the overtime wages of employees such as those in this action, that maritime law did not preempt state overtime regulations. This is also the position taken by the employees and the United States.

This conclusion, however, does not consider all appropriate aspects of maritime law. The first aspect is that the employment relationship between the maritime employee and his employer is governed by maritime contract law. In *Union Fish Co. v. Erickson*, 248 U.S. 308, 39 S.Ct. 112, 63 L.Ed. 261 (1919) the Supreme Court held that California's statute of frauds was preempted by federal maritime law when raised in defense to a maritime contract claim. In reaching this decision, the Court stated that an employment contract between the master of a vessel and the vessel's owner is maritime in nature, and that any claim under the contract must be resolved pursuant to federal admiralty law.

The second aspect not considered is that absent an express contractual agreement to overtime pay, admiralty law has no requirement that a seaman receive such pay. *Sorensen v. City of New York*, 202 F.2d 857, 858–59 (2d Cir.1953), *cert. denied*, 347 U.S. 951, 74 S.Ct. 674, 98 L.Ed. 1097 (1954). The lack of an express overtime pay requirement for seamen under federal admiralty law does not necessarily mean that the federal government left the issue open to be decided by the states. To the contrary—cases reveal that courts, regardless of state law, typically enforce employment contracts under admiralty law with respect to overtime pay. *See, e.g., The Youngstown*, 110 F.2d 968, 970 (5th Cir.1940), *cert. denied*, 311 U.S. 690, 61 S.Ct. 69, 85 L.Ed. 446 (1940) (overtime performed and paid for in accordance with employment contract fully complies with the federal admiralty law); *C.M. Rousseau, Jr. v. Teledyne Movable Offshore, Inc.*, 619 F.Supp 1513, 1518–19 (D.La.1985) (maritime employees held bound by employment agreement with respect to overtime claim).

As Justice Story stated in the historical case of *DeLovio v. Boit*, 2 Gall. 398, 7 F.Cas. 418 (C.C.Mass.1815) (quoted in 14 C. Wright & A. Miller, Federal Practice & Procedure § 3675), admiralty jurisdiction of the federal courts "comprehends all maritime contracts ... wheresoever they may

be made or executed, or whatsoever may be the form of the stipulations." *Delovio,* 7 F.Cas. at 444. The employers point out that while the admiralty statutes do not specifically provide for overtime pay, admiralty law has developed through the federal courts to the point that the absence of overtime regulations means that maritime employers and employees may freely negotiate for the terms of the employment contracts apart from the strictures of state regulations.

This interpretation makes sense in light of the fact that the conditions under which maritime employees work, especially those working on the high seas, are substantially different from land-based employees. Land-based employees are able to return home every night after work whereas often in maritime situations employees are required to be transported to a work station on the high seas, remain at sea for days at a time and subsequently be transported back to land. This aspect of maritime life has not changed for centuries and must have been understood at the inception of admiralty law.

> The general system of maritime law which was familiar to the lawyers and statesmen of the country when the Constitution was adopted, was most certainly intended and referred to when it was declared in that instrument that the judicial power of the United States shall extend "to all cases of admiralty and maritime jurisdiction."

*The Lottawanna,* 21 Wall. (88 U.S.) 558, 574, 22 L.Ed. 654 (1874). Justice Bradley went on to explain that in order to ascertain what the maritime law of this country is, if it is unclear from the laws and Constitution, "we must resort to the principles by which they have been governed." *Id.* at 576. Under this analysis, given that the maritime statutes do not provide for overtime compensation, one must resort to the principles by which maritime activities have been governed. Those principles are, as stated by the employers, that each maritime employee has been able to negotiate his own contract—to define and to include or not to include pay for overtime work. It is against this historical background that

this case should be considered and it is through this historical background that one must conclude that state laws mandating overtime pay are preempted by federal admiralty law.

## II. Preemption under the FLSA

The employers contend that state overtime regulations are not only preempted by federal admiralty law, but by the FLSA. The District Court found this argument "much more persuasive" than the preemption argument under federal admiralty law. 709 F.Supp. at 1524.

Section 207(a) of the FLSA provides overtime pay for employees who are engaged in "commerce or in the production of goods of commerce." The district court concluded that because the employees are tied closely enough to commerce in that they are involved in the oil production industry, they are covered by this section of the FLSA. *Wirtz v. Intravaia,* 375 F.2d 62, 65 (9th Cir.), *cert. denied,* 389 U.S. 844, 88 S.Ct. 90, 19 L.Ed.2d 110 (1967); see also 29 U.S.C. Section 206(a)(4) (expressly applying minimum wage requirements to seamen).

The inclusion of seamen within the ambit of the FLSA is complicated by two other provisions of the Act. The first is 29 U.S.C. Section 213(b)(6) which exempts seamen from the FLSA's overtime compensation provisions. The District Court concluded that this specific exclusion of seamen from the overtime provisions further supported the argument that states were preempted from applying their overtime regulations to seamen such as the ones in this case. The district court stated:

> Congress has spoken directly on the issue of overtime pay for seamen. Therefore, California labor laws are preempted to the extent that they presume to regulate FLSA exempt seamen, both on the high seas and within the territorial zone. Further, given Congress' exemption of these seamen from even minimal federal overtime provisions, it would be at odds with the federal scheme to permit the states to enforce stricter overtime provisions via the FLSA's savings clause.

709 F.Supp. at 1525. This conclusion seems not only logical, but the only reasonable inference that could be drawn from Congress' explicit exemption of seamen from the overtime provisions of the FLSA.

The employees and the United States argue that this conclusion is unreasonable in light of the savings provision of the Act and cases which discuss that savings provisions. The provision states:

No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum workweek lower than the maximum workweek established under this chapter.

29 U.S.C. Section 218(a). The employees and the United States claim that this provision clearly shows congressional intent to allow the states to set more generous overtime rates, even for seamen, than those established by the FLSA. While this argument seems on the surface to have some merit, it is weak in light of Congress' specific exemption of seamen from the overtime provisions already found in the FLSA. It is reasonable to conclude that seamen are exempt from mandatory overtime provisions and that Congress did not intend to leave the matter to the states to set overtime provisions for maritime employees on the high seas. As was concluded by the district court, "in light of the obvious conflict between California's overtime compensation provision and the FLSA, the FLSA preempts California's provision." 709 F.Supp. at 1525.

### III. Conclusion

The decision of the District Court to grant the declaratory and injunctive relief should be AFFIRMED. The decision is properly based either upon preemption under general admiralty law or preemption under the FLSA.